*Appeal No. 26-2190*

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

Rebecca Scofield,

*Appellee,*

v.

Ashley Guillard,

*Appellant.*

---

On Appeal from the United States District Court
for the District of Idaho
Hon. Raymond E. Patricco
Case No. 3:22-cv-00521-REP

---

**APPELLEE REBECCA SCOFIELD'S
SUPPLEMENTAL EXCERPTS OF RECORD**

**Volume 5 of 6 (SER 733-936)**

---

WENDY J. OLSON, Bar No. 7634
wendy.olson@stoel.com
CORY M. CARONE, Bar No. 11422
cory.carone@stoel.com
STOEL RIVES LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID 83702
Telephone: 208.389.9000
Facsimile: 208.389.9040

*Attorneys for Appellee Rebecca Scofield*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

---

| | |
|---|---|
| REBECCA SCOFIELD, | Case No. 3:22-CV-00521-REP |
| Plaintiff, | Volume I of IV |
| vs. | Boise, Idaho |
| ASHLEY GUILLARD, | February 24, 2026 |
| Defendant. | 11:44 a.m. |

---

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

BEFORE THE HONORABLE RAYMOND E. PATRICCO
CHIEF UNITED STATES MAGISTRATE JUDGE

---

APPEARANCES:

For the Plaintiff: MS. WENDY OLSON
MR. CORY MICHAEL CARONE
Stoel Rives, LLP
101 S. Capitol Boulevard, Suite 1900
Boise, Idaho 83702

For the Defendant: MS. ASHLEY GUILLARD
3262 Westheimer Rd, 942
Houston, Texas 77098

Court Reporter: MS. ANNE BOWLINE, RMR, CRR
Anne_Bowline@id.uscourts.gov

*Proceedings recorded by stenography; transcript produced by computer-aided transcription.*

# I N D E X


| JURY INSTRUCTIONS | PAGE |
|---|---|
| preliminary instructions read by the Court | 4 |

| OPENING STATEMENTS | PAGE |
|---|---|
| Ms. Olson | 18 |
| Ms. Guillard | 26 |

| PLAINTIFF'S WITNESS | PAGE |
|---|---|
| REBECCA SCOFIELD | |
| Direct Examination by Ms. Olson | 31 |
| Cross-Examination by Ms. Guillard | 107 |

| PLAINTIFF'S EXHIBITS | RECEIVED |
|---|---|
| 19 | 57 |
| 20 | 62 |
| 21 | 66 |
| 25 | 73 |
| 26 | 75 |
| 32 | 93 |
| 35 | 102 |
| 36 | 104 |
| 40 | 45 |

Thursday class so they could all go home early.
Q. And the Thursday class would have been November the 17th, the Thursday before Thanksgiving; is that correct?
A. That's correct.
Q. Professor Scofield, do you remember when you learned the identity of the students who were killed?
A. I don't remember the exact moment that I did. Like I said, I think I must have known before my class on Tuesday, but I don't have a strong memory of that.
Q. When you learned the names of those students, it was obviously before Thanksgiving; is that correct?
A. That's correct.
Q. And did you know any of the students once you learned their names? Did you know any of the students?
A. I did not.
Q. To your knowledge, had you ever taught any of them?
A. I had not.
Q. In that week before Thanksgiving, what was it like being in Moscow, Idaho?
A. Moscow's a really small town, small college town. And in late November it starts getting dark at like 3:30 in the afternoon, and there was just this sort of oppressive atmosphere that settled over the campus. Everyone was really upset, really scared, and it just felt very dark and frightening.

Q. Were you beginning to hear speculation about what had gone on and who might be responsible?
A. Yes. Within a couple of days, online speculation started to increase rapidly, and there was already a lot of theories being bandied about in that week prior to Thanksgiving.
Q. And is that part of what made everything feel on edge?
A. Absolutely.
Q. Professor Scofield, did you have plans for the Thanksgiving holiday?
A. Yes. My in-laws always come up to Moscow to celebrate Thanksgiving with us, and we discussed potentially shifting it. But we had scheduled family photos for that weekend, which is hard to do sometimes, and then I was scheduled to have a full hysterectomy on December 1. So we decided to keep our tradition of staying in Moscow and have my in-laws come up for that.
Q. And when you refer to your in-laws, that's your husband John's parents; correct?
A. Yes.
Q. Anyone else?
A. John's sister, her husband, and their child also came up.
Q. All right. Professor Scofield, I'm next going to direct your attention to Thanksgiving Day, November 24, 2022. Do you recall that day?
A. I do.

Q. What happened?
A. The morning was pretty busy. John and his sister really love to cook together, and we were all getting ready for the meal. And about midmorning the kids were getting stir-crazy, and so we decided that John, his sister, and I were all going to walk them down the street to a park to kind of get the wiggles out.
Q. When you were doing that, what, if anything else, did you do?
A. I checked my work email, and we were almost to the park when I sort of pulled it up on my phone and looked at it. And I saw an unfamiliar name, and so I clicked on it. In the body of the email, it just said, "Hi, I'm an alumna. I think you should watch this."
Q. What did you do when you read that email saying, "I think you should watch this"?
A. I actually handed the phone to my husband, because he's an IT professional, and I have been known to click on not great links. And I showed it to him and I asked, "Does this look okay to click on?"
Q. And what was his response, if any?
A. He clicked on the link and watched it first, and I saw his face.
Q. What did you see in his face?
A. Alarm. And he immediately closed it, handed the phone

back to me, and said, "Don't watch that."
Q. Did you follow your husband's direction?
A. No, I did not.
Q. What did you do?
A. My sister-in-law and I decided to watch it anyways, and we clicked on the link, and a video came up.
Q. What was your reaction when you saw the video in the link?
A. I was shocked and stunned, speechless.
Q. Did you watch the video in the link one time?
A. We watched it many times.
Q. And when you say "we," who do you mean?
A. My sister-in-law, my husband, and I.
Q. And where were you when you were watching this video in the link over and over again?
A. We were standing in the park.
Q. Why did you watch it over and over again?
A. I think I was just so confused. I didn't understand what was happening. I didn't understand who this person was, why they had my photo, why they thought I knew the students at all, why they were saying these things.
Q. You've said a few things that sound like details from the video you saw.
A. Yeah -- yes.
Q. What do you recall about the video that you watched?
A. So when I clicked on it, the video started, and it was a

person obviously referencing the killings of our students. And she simply said, "And this is the teacher who ordered the execution of the students," and she sort of steps aside, and it's my photo.

Q. Did you recognize the person who made the video?

A. I did not.

Q. What impact did this video have on your Thanksgiving?

A. For me, it derailed the day. John and Jenny worked really hard on the meal, and I tried to just seem normal in front of my in-laws and my kids while also trying to figure out what next steps I should take.

Q. And how was your -- what were your emotions like at the time?

A. It was already a really dark and scary time, and my initial emotions were pretty panicked of how do I make this stop as fast as possible.

Q. Professor Scofield, I'm going to direct your attention to that screen in front of you, and then Ms. Bibb will be bringing up what we've marked for identification purposes as Exhibit Number 40 and just sort of the front part of that. Professor Scofield, do you recognize the initial picture here on Exhibit Number 40?

A. Yes. This is a screenshot from that first video I saw.

Q. And how do you recognize this as the -- as a screenshot from the first video that you saw?

A. Because I will never forget it.
Q. And this is the screenshot from that TikTok video attached to the email that you looked at on November 24, 2022; correct?
A. Correct.
Q. Prior to your testimony here at trial, Professor Scofield, have you watched Exhibit 40 all the way through?
A. Yes, I have.
Q. And is Exhibit 40 a true and correct copy of the TikTok video you watched --
A. Yes, it is.
Q. -- from the link in the email on November 24, 2022?
A. Yes, it is.
MS. OLSON: Your Honor, at this time I'd offer Exhibit Number 40.
THE COURT: Ms. Guillard, any objection?
MS. GUILLARD: No objection.
THE COURT: Exhibit Number 40 will be admitted.
(Plaintiff's Exhibit 40 received.)
THE COURT: Do you wish to publish it?
MS. OLSON: Yes, Your Honor.
THE COURT: All right. You may.
(Playing video.)
Q. (BY MS. OLSON) And, Professor Scofield, was that the entirety of the video that you saw on November 24, 2022?
A. Yes. That was the entirety of that video.

Q. Professor Scofield, you've described a little bit of what you did when you got back to your house. What else did you do?
A. After I talked about it a little more with John and his sister, I decided I needed to do something, so I forwarded the message to my dean, Sean Quinlan, and simply said, "This is really scary. I don't know what to do."
Q. What happened after you forwarded the video in Exhibit Number 40 to Dean Quinlan?
A. Dean Quinlan called pretty quickly afterwards, and we discussed next steps.
Q. Based on your conversation with Dean Quinlan, what did you do as next steps?
A. I immediately called the Moscow Police Department. I informed them of the allegations in the video, and then I called the UI security office.
Q. Did you actually talk to anyone when you called the Moscow Police Department?
A. I initially just left a message, and then a little bit later a police officer called back.
Q. And did you talk to that police officer when he called you back?
A. Yeah -- yes. He called and said that he had watched all ten videos, which I didn't know there were already ten videos, so that was very shocking. He simply said that they would

keep an eye on it and that they would reach out to me if they had any further questions.
Q. And do you know whether or not contact was made with the University of Idaho IT security?
A. Yes. Both Dean Quinlan and I reached out, and they immediately removed all of my information from all of UI's various websites. So that's the department web page but including a lot of my research projects and other web pages that the university had.
Q. And did you have any conversations with the UI security about what other steps you could take at that point with respect to your security?
A. Yes. They suggested I lock down my social media.
Q. Did you have any social media at the time?
A. I did not have much. I just had Facebook, which was mostly pictures of my children, and then a LinkedIn.
Q. And what does it mean, if you know, to lock down your Facebook?
A. So they helped me walk through how to move my privacy settings so that only my friends could see my posts on Facebook.
Q. Did you do anything else or talk to anyone else that night, November 24, 2022?
A. Yes. After we had dinner and we got the kids to bed, I reached out to a friend who's a lawyer with the ACLU and asked

if she would watch the videos and give me her opinion.
Q. And after you talked to her, did she suggest that you take any other action?
A. She suggested that I do not go on social media and try to combat it by just posting my own TikToks. She suggested I reach out for legal advice, and she suggested you, Wendy Olson.
Q. Did you talk to anyone other than your friend the lawyer from the ACLU that night?
A. Yes. I called my good friend Chris.
Q. Your friend Chris in Portland?
A. Chris in Portland.
Q. And did you have a conversation with him about what had happened?
A. Yes. So I filled him in on what had happened. He's much more tech savvy than I was. He sounded extremely upset, and he said that he would help start monitoring stuff online for us.
Q. Do you recall approximately what time it is that you reached out to Mr. Hanson?
A. I think it was pretty late, like 10 p.m.
Q. Professor Scofield, were you able to sleep that night?
A. No, I was not.
Q. Why not?
A. I felt like I was having a panic attack.

Q. How did that feel?
A. Racing heart, sweating, blood rushing. I couldn't breathe. Yeah, I just felt like my heart was going to explode.
Q. What did you do?
A. I went -- I went and laid in my son's bed because his bedroom is the closest to an entrance to our house. And I was so afraid for him, so I just sat there at the end of his bed all night and watched him.
Q. Professor Scofield, what happened the next day, the day after Thanksgiving?
A. My in-laws were staying for another day, so we -- I just got up with everybody, tried to be a good hostess and daughter-in-law and mom, and we watched the Boise State game in the morning. And then in the afternoon, you know, I made sure the kids looked nice and we went and had family portraits taken.
Q. Professor Scofield, when did your in-laws leave to return to Emmett?
A. They left early the next morning, on Saturday.
Q. Had you told your in-laws, meaning your mother-in-law and your father-in-law, about the video in Exhibit 40 when they left Moscow for Emmett the morning of November 26?
A. No, we had not.
Q. Why not?

A. We wanted them to enjoy the weekend and to have those memories and to not scare them, and we were very hopeful that we could stop it.
Q. What did you do then that Saturday after your in-laws left to drive back to Emmett?
A. As soon as everybody left, John and I sat down, talked about everything, sort of reviewed the number of videos, and we decided some very radical security changes needed to happen.
Q. Professor Scofield, what security did you have at the time?
A. Barely any. We had grown up in Emmett. We lived in Moscow. These were really safe places, so we barely locked our doors.
Q. Did that change?
A. It did.
Q. How?
A. We immediately started locking the doors. I locked them day and night, anytime we were in the house, I mean, just all the time. And then we also -- John looked into getting a security system for our entire property.
Q. Was it hard for you to make those changes?
A. It was. I mean, I think John and I still had a small town perception of the world, and it was hard for us. But it was even harder for our kids, who were very young at the time.

And we were doing all of a sudden all of these not normal things, and so we had to explain them away, you know, talking about the security system like, "Oh, we're going to watch the foxes," and things like that and just trying to make sure everything seemed as stable and normal for them as possible.
Q. What happened next with respect to the TikTok videos?
A. There were just so many of them by that afternoon, and they were being watched hundreds of thousands of times. It felt like the hope that we had to contain it quickly was very rapidly slipping away.
Q. Were you communicating on that day with your husband, John, and your friend Chris?
A. Yes. They were trying to figure out who this person was and why she was targeting me.
Q. Did you learn anything more about her?
A. All we learned is that she promoted herself as an online sleuth. That was really all we knew.
Q. And in that small amount of additional information, could you tell if this was someone you knew?
A. We knew that she was not someone we knew, and sort of her basic information was very, very clear she was not in Moscow.
Q. Did you tell your parents?
A. Yes. After we did our risk assessment that day, we decided we couldn't really keep it from our families anymore. So I reached out to my parents and told them and to my

siblings. And then when Tom and LeAnn got home later, we called and let them know as well.
Q. Who are Tom and LeAnn?
A. My in-laws.
Q. Why didn't you tell your parents right away?
A. I think when you're in the middle ages, you try really hard to protect your parents as much as your kids, and I just didn't want them to be afraid. They were already afraid that we were in Moscow and that this horrific thing had just happened. We didn't want to add to that.
Q. Other than telling your parents and John's parents and your brothers, did there come a time when you told other family members?
A. We didn't reach out to any other immediate family right away. It was much -- well, not much later. It was a few more days until we told many other people. But we did tell our neighbors.
Q. You told your neighbors that weekend?
A. Yes, just to let them know what was going on in case they saw anything suspicious that they could let us know. In the neighborhood we live in, there were no fences, so we just wanted them to keep an eye on the kids and just look out for each other.
Q. How were you feeling about your security at the time?
A. Just very vulnerable and exposed.

Q. Why?
A. Already the speculation was just growing and growing and people's concerns about the fact that there were no suspects or even no leads, and all of a sudden my name was being shouted into a world where four young people had just been killed and there was a person who had done it still possibly in our community. It just felt like any security blanket I had ever had had been ripped off.
Q. Did you talk to anyone else in that time, that weekend after Thanksgiving?
A. I talked to you, Wendy Olson.
Q. And did you make any decisions about what to do after your conversation with me?
A. I decided we needed to send a cease and desist letter before my hysterectomy that next week.
Q. Why did you feel like you needed to send a cease and desist letter before your upcoming hysterectomy?
A. I was just trying to get everyone stable and protected, and I felt that maybe if we sent a letter, this person would realize that I was a human who had a family. And it seemed to be a respectful and responsible way to approach it.
Q. In addition to deciding to send the cease and desist letter in those days leading up to your scheduled hysterectomy, what other steps did you take regarding managing your life around the TikToks online?

A. I was really focused on getting the household ready for my hysterectomy and major surgery. I was really trying to not spiral and watch all the videos and read all the comments, and so I was trying to practice avoidance and just trying to act normal in front of the kids. They already knew about the murders, and we didn't want to scare them even more.

Q. Did you have communications with people at the university regarding what was going on and particularly in light of your upcoming hysterectomy and the TikToks?

A. Yes. As soon as Monday rolled around, we were sort of in constant contact, regular check-ins with my dean to manage the situation on campus. And then we also reached out to our kids' schools. I talked to their teachers and principals and also counselors to make sure that there were increased security protocols in place for them.

Q. And what did those increased security protocols consist of?

A. We had a pretty long list of approved pickups previously, and we narrowed those down to just myself, my husband, or my mom. And we asked that they just monitor the kids very closely outside. A lot of the playgrounds in Moscow don't have fences, and to let us know if they saw anything suspicious. And then also with regards to their teachers and counselors, letting us know if they were having any increased mental health issues or concerns or anxiety.

A. I did.
Q. Did you have any thoughts going into that knowing that these videos were out there?
A. I remember very distinctly John driving me to the hospital and I just remember thinking if something goes wrong and I don't wake up, these are just what's out there. This is just what's being said, and I will have never gotten the chance to stop them.
Q. Professor Scofield, after your surgery did the TikTok videos have any impact on your ability to recover at home?
A. Yes. I mean, in early December it almost became a full-time job. We just had sort of waves of inquiries coming in from friends and family. I was doing routine check-ins with my university, with my kids' school, with our parents. I was getting phone calls from, you know, friends all the way in the UK who were having this just crop up in their feeds.
And then I also started to get really strange calls and messages, sometimes to my personal phone. Sometimes they were just random people, you know, asking if this was true. Other times it was journalists. And it just felt like there was no -- there was no time in which I just healed.
Q. Professor Scofield, did you have any professional projects at the time aside from teaching the class that we've discussed?
A. Yes. So I was also working on a coauthored book. I was

revising a coauthored play. We were hiring a director for that and working with a museum. I was still working on my oral history project. I had numerous articles and chapters in edited collections out for review. So just a lot of things up in the air.
Q. Did you have to do anything at the time to let the others that you were working with on those projects know about the TikToks that were being posted online falsely stating that you had orchestrated the murders and falsely stating that you had had an affair with a student?
A. Yes. I had to reach out individually to my publisher, to my coauthor, to every collaborator on every project and let them know of these horrific allegations that I had engaged in sexual misconduct or in orchestrating the murders of our students.
Q. Why did you think you had to reach out to those people and let them know?
A. Because at the time if you typed "Rebecca Scofield" into Google, it autopopulated "Moscow murders." And it was very obvious that people -- throughout our campus and community and nationally, people were just finding out about it on their TikTok feeds.
Q. And what concerns did you have at that time for your professional work?
A. In particular the -- it put at risk anything that was

public facing, anything that had my name on it. I had to find out whether collaborators were still willing to work with me on it. I also knew that this obliterated any hope I had of having an online presence, so I wouldn't be able to promote any of this work that I'd been working on for years with collaborators.
Q. Professor Scofield, at this time did you know anything more? Had you learned anything more about who Ashley Guillard was?
A. We hadn't really learned anything more, only that her selection of me seemed extremely arbitrary.
Q. Professor Scofield, in December, after your surgery, did you take any other action?
A. We decided to send a second cease and desist letter.
Q. Why did you decide to do that?
A. Because we were still hoping she would stop.
Q. I'll next direct your attention to Exhibit 20, and you can either look at the screen in front of you or in the book at tab 20. Do you recognize Exhibit 20?
A. I do.
Q. And what do you recognize it, Exhibit 20, to be?
A. It's a copy of the second cease and desist letter that we sent.
Q. And how do you recognize it as a copy of the second cease and desist letter?

A. Because I reviewed it.
Q. And did you authorize this cease and desist letter to be sent?
A. I did.
MS. OLSON: Your Honor, at this time I'd offer Exhibit Number 20.
THE COURT: Any objection, Ms. Guillard?
MS. GUILLARD: No objection.
THE COURT: Plaintiff's Exhibit Number 20 will be admitted.
(Plaintiff's Exhibit 20 received.)
THE COURT: Do you wish to publish?
MS. OLSON: Yes, please, Your Honor.
THE COURT: You may.
MS. OLSON: And, Ms. Bibb, if you would again sort of zoom in on that top left portion.
Q. (BY MS. OLSON) The second cease and desist letter, what is the date on that?
A. December 8, 2022.
Q. And why did you authorize this cease and desist letter to be sent?
A. Because she hadn't stopped after the first one.
Q. And was your purpose the same in sending this one?
A. Yes.
Q. What action did you request Ms. Guillard take?

A. That she remove all existing content, that she stop making new content, and that she apologize.
Q. To your knowledge, did she do that?
A. No, she did not.
Q. And this letter, Exhibit Number 20, was sent also to a street address in addition to the email; is that right?
A. That's correct.
Q. Professor Scofield, do you know if Ms. Guillard received the second cease and desist letter?
A. Yes, she did receive it.
Q. How do you know that?
A. Because she made a TikTok video where she put the letter on a roll of toilet paper.
Q. Did the TikTok videos continue after December 8, 2022?
A. Yes, they did.
Q. And was there anything new and concerning about them?
A. Yes. They became more elaborate and detailed. It was like listening to a plot of a movie or a book but somehow my name was the -- one of the main characters. It was a moment when I felt like I had lost ownership of my face and my name, that they were no longer stitched to my body. It became increasingly obvious that she was seeking out information about my family, including my husband's name, and it was utterly terrifying.
Q. Did you have concerns at this time about your physical

safety?
A. Yes, we did -- I did.
Q. Why was that?
A. By this time there still wasn't any news in the case, and the entire town was pretty on edge. People again were just desperate for answers and looking for anyone to provide those.
Q. How did those concerns and that fear affect your behavior?
A. I essentially stopped sleeping at all, and I just wandered the hallway outside my kids' rooms, just like back and forth, because I think one of my greatest -- maybe the greatest fear I had was that this person was still out there and that they would take an interest in my family. And I didn't want my kids to die first, so I just wanted to be there, present.
Q. At the time, Professor Scofield, were you generally aware of what was going on with the investigation of the murders?
A. No. They weren't making anything public at the time, so it just very much felt like it was spiraling in those weeks in Moscow.
Q. And did that have any impact on you?
A. This was a huge rupture in our town. It was this horrific event that had happened, and it was the worst thing in living memory. And it felt like a lot of people were finding ways to connect and to grieve and to process this tragedy, and when it had first occurred that felt like something I could be a part of. And then after the false allegations, it felt like all of

a sudden I was pulled into that orbit and I needed to internalize all that fear that was part of that crime and that I could no longer be a part of the wider community.
Q. Professor Scofield, after you knew Ms. Guillard had received the second cease and desist letter but didn't stop posting the TikToks with the false accusations, what did you do?
A. John and I talked about it, and we saw this as a direct threat to our children, to the career I had built, and we decided someone had to take a public stand against this type of false statements. So we decided to file the lawsuit.
Q. And, Professor Scofield, did you ever talk to any officer or to people at the Moscow Police Department other than that first night that you saw the TikTok?
A. I called back a couple of times and just updated their file and said that there were more and more allegations and more and more videos and that they were, you know, being watched and circulated. But I never talked to another police officer. They never reached out.
Q. And so when you would call and update the file, what were you actually doing?
A. I was just talking to the person they had in charge of the nonemergency line at the time. So I would just state to her, you know, "I talked to an officer, you know, a while back. These are the allegations being made. Here's the information

on how to find them on TikTok," and just giving a sort of basic update to the police department.
Q. Professor Scofield, did you come to learn that the Moscow Police Department issued a press release regarding the statements that were being made about you and whether you were likely involved in the murders?
A. Yes. That happened, I believe, on December 27.
Q. I'm going to direct your attention to Exhibit Number 21. And do you recognize Exhibit 21?
A. Yes. This is the press release that the Moscow Police Department distributed.
Q. Dated December 27, 2022?
A. Correct.
MS. OLSON: Your Honor, at this time I'd offer Exhibit 21.
THE COURT: Ms. Guillard, any objection?
MS. GUILLARD: No objection.
THE COURT: Plaintiff's Exhibit Number 21 will be admitted and published if you wish.
(Plaintiff's Exhibit 21 received.)
MS. OLSON: Yes, please, Your Honor.
Q. (BY MS. OLSON) And, Professor Scofield, I'll have Ms. Bibb zoom in on the top of it and then the first bullet point. And, Professor Scofield, will you please read aloud that first bullet point.

A. "At this time in the investigation, detectives do not believe that the female associate professor and chair of the history department at the University of Idaho suing a TikTok user for defamation is involved in this crime. The Moscow Police Department will not provide a statement about the ongoing civil process."
Q. And, Professor Scofield, to your knowledge, did the TikToks continue after this press release was issued?
A. Yes, they did.
Q. Professor Scofield, what was the impact on you as you were heading into the holidays?
A. I think, like most parents, I wanted to cocoon my kids and have all the sugar and the *Muppets Christmas Carol* and give them a magical Christmas, but I was constantly being pulled away, stepping out of the room to answer phone calls about the false accusations, whether from journalists, university colleagues, friends, family, random people who found my number online.
Q. Professor Scofield, did you travel at all after the -- over the Christmas holidays?
A. Yes. So on -- we spent Christmas Day at home, and then the next day we drove down to Emmett to spend time with our extended families.
Q. What was that like for you?
A. We were -- we were really excited to go because Moscow

felt so hard and everything felt so hard. But Emmett is a really, really small town too, so everywhere we went, you know, the Dollar Store or Albertsons, to dinner, people would ask. It was just omnipresent. We couldn't escape it. And this had been going on for a month at the time, and it was like a stone on my chest. It wasn't even just crushing me; it was dissolving me. I was unravelling underneath the weight of it.

Q. Professor Scofield, with how you were feeling while you were there in Emmett and what had gone on before, did you consider options about what to do with respect to the spring semester at the University of Idaho?

A. Yes. John and I talked about the kids and I moving to Emmett for a while.

Q. Did you decide to do that?

A. We didn't. It was very hard, but we just wanted the kids to maintain normalcy at their own school.

Q. What impact, if any, did all of that have or what options were you considering regarding your upcoming teaching responsibilities?

A. So I was scheduled to teach in the spring our Intro to U.S. History course, 1877 to the Present, and that's a really large, 100-level course. So it has about anywhere from 70 to 100 students in it. And as we were going through that last week of December, I just didn't know that I could face

students and colleagues and be in front of that many people. So I reached out to my dean, and we talked about whether it was an option to move my course online if necessary. He was supportive and said if that was something like we felt we had to do for our security, that he would support that.

Q. Professor Scofield, did there come a time that you learned that someone had been taken into custody with respect to the murders of the four students?

A. Yes, on December 30.

Q. How do you recall that it was December 30 that you learned that information?

A. Because I was driving my father to the emergency room with RSV and immediately dropping him off and then driving my mom over for a significant doctor's appointment in the Nampa-Caldwell area. So I was actively driving at the time that we got the news.

Q. What was your reaction?

A. Elation, relief for the families, for our community. I thought that it was over.

Q. What do you mean by "I thought it was over"?

A. I thought the accusations towards me would stop.

Q. Did they stop?

A. They did not.

Q. What happened?

A. As we went into January, we went back up to Moscow, and I

resumed teaching in person. But Ms. Guillard just kept making statements. Stories changed, but I was still always named as an abuser, as a murderer. And even though Moscow felt so much better, it just kept getting worse in a lot of ways for us, for me.
Q. What impact did it have on you that -- these TikToks or other video content still identifying you as someone involved in the murders, what impact did that have on you?
A. It just felt mired, like I was stuck in mud, not moving forward. And I started to have conversations with other moms who had their children going through similar things or through other people who had had similar experiences. And I just -- I just cried with a lot of people about this overwhelming sense of hopelessness and inability to make the -- these things stop.
Q. At that point did you attempt to get any medical or mental health treatment?
A. Yes. Dean Quinlan and I had talked about mental health options with our insurance. At the end of December and in January, once we were back, I started reaching out. But Moscow is a small place, so after many rounds of attempts, I was finally able to get a therapy appointment for May 2023.
Q. Professor Scofield, describe your physical condition in January of 2023.
A. My physical health had started on a downward spiral. I

A. "Because damage could result to the career and reputation of any person who is accused of sexual harassment falsely or not in good faith, all investigations of and hearings on such matters will be conducted insofar as possible to protect the privacy of and minimize suspicion toward the accused as well as the complainant until the matter is impartially resolved. Only those persons who are responsible for investigating or enforcing civil rights matters will have access to confidential communications."
Q. And then paragraph or section D refers to the resolutions of complaints; is that right?
A. Correct.
Q. And in paragraph D-2, what sanction could be placed on a faculty member if they violate this policy on sexual harassment?
A. Up to dismissal.
Q. And, Professor Scofield, would having a sexual relationship with a student potentially violate the sexual harassment policy?
A. Yes, it would.
Q. Professor Scofield, were there other impacts on your career?
A. This has touched all aspects of my career.
Q. Were you concerned about whether or not you would be promoted?

A. Absolutely.
Q. Why?
A. As the policy just said, all you need is the suspicion of misconduct. Whether there's any basis for that accusation, that rumor can implant itself in people's perception of you. If students think there's a reason you needed to be investigated, they are not going to trust you. It becomes almost impossible to do your job let alone do your job well.
Q. And that would be the case even if a student heard you were being investigated?
A. Absolutely. If they think there's a reason for you to be investigated, then it already casts suspicion on you.
Q. Professor Scofield, did you weigh the worth of your reputation as you were going through this?
A. Yes, almost daily. But each time John and I talked about it or I thought about it, my reputation was everything. It was everything we had worked for since high school, since -- every scholarship dollar, every fellowship dollar, every penny of my current salary and future salary and everything that I had poured into teaching, work trips, and prep. It was my entire career.
Q. Professor Scofield, how would you describe the reputation that you had built to that point?
A. It was excellent. I had worked for 15 years by that point with not only my colleagues in grad school and at UI but with

granting agencies and publishers and collaborators and community members with the communities I worked with. I had worked very hard.
Q. How was that reputation you'd worked hard to build at risk from Ms. Guillard's TikTok false statements?
A. In many ways that reputation was harmed irrevocably. I've had many conversations with colleagues who will tell me that they had a colleague or a family member or someone reach out to them and ask about me, ask if there was any truth to the allegations, ask if maybe I knew the person who was accusing me or had done something to make myself a target. That simply has stitched itself to my name.
Q. Professor Scofield, over what time period did you receive these inquiries?
A. The last one happened in October this year -- I'm sorry -- 2025, this fall -- last fall.
Q. Professor Scofield, has this affected how you do your job?
A. Yes, in all ways.
Q. How has it affected how you do your job?
A. It has made me less than I could have been. All of the mental exhaustion that has come into managing these horrific allegations took creative energy away from my research, from my teaching prep, from managing my department. It simply changed who I was as an academic.
Q. Professor Scofield, are you worried about the impact on

the research that you're doing or that you were doing?
A. Yes. A lot of the research I do is -- could already make me or my family a target, and every time I went to publish something over the last three years, whether it was an op-ed or a book or anything, I had to wonder, was this just making my family less safe? Was this just drawing more notice? Was I recklessly endangering my children by publishing?
Q. Has it had an ability -- excuse me. Has it had an impact on your ability to promote your work?
A. Yes. I essentially don't exist online anymore. I didn't have a huge presence previously, but even my personal website that my husband built me does not have my contact information on it. At this point when I'm asked in interviews how people can find me online, I simply say they can't.
This is extremely important because in academia, when you go to publish a book, most academic scholars aren't going to get large book deals with, like, $50,000 advances and large marketing packages. Instead, the press really depends on authors to promote our own work through our own online networks but then also going to conferences or doing in-person talks, working with colleagues on course adoptions, those sorts of things.
So I've had to have multiple conversations with presses to simply say that I can't do those things that other authors would do and to try to find ways to still be useful.

the work that I take so much pride in, they were watching videos about how horrible of an abuser and a murderer I was, and I had no ability to stop those accusations from happening.
Q. Did you have any feelings of guilt?
A. Especially initially, I think it's one of the things I struggled with the most, especially talking to my husband. If our children die because of this, it'll be my fault because I had a job that had my picture on the Internet, that I put them at risk for my dream of being a professor. And I still feel like ultimately they'll bear the weight of this and that everything John and I worked for decades for will just not be enough to protect them from this.
Q. And are -- those feelings and those struggles that you've described with your mental health, are those the things you would talk to Ms. Bohn about?
A. Yes, on a very regular basis.
Q. And are those the things that you were seeking treatment from your primary care provider for?
A. Yes.
Q. Including the medications that you've described?
A. Yes.
Q. And do you have these as ongoing struggles with your mental health?
A. Yes. I definitely still struggle with hypervigilance, like checking locks and window latches and wandering the house

at night with anxiety about safety all the time and depression and anxiety about my job and certainly overwhelming feelings of hopelessness and vulnerability.

Q. And, Professor Scofield, I know you testified that Ms. Bohn is retiring or has retired, but do you plan to continue receiving mental health treatment counseling services similar to those provided by Ms. Bohn?

A. Yes, I do. I'm already working to try to find a new provider as soon as possible.

Q. Professor Scofield, you testified earlier about some of the impacts on your physical health. I'd like to talk to you a little bit more about that. Have there been physical manifestations of the emotional trauma that you've described in your testimony?

A. Yes. The -- just the strain of this exacerbated the whole slew of new symptoms that I think I began to mention earlier.

Q. What issues did you develop physically?

A. Headaches that are severe and persistent, neuropathy, tingling, nerve compression, just general body clamping down on itself and not being able to release.

Q. When did those symptoms begin?

A. They started in mid-December, after my surgery, and became really, really a sort of hindrance to everyday life by about mid-January.

Q. And what did you do to address the physical impacts from

the strain that exacerbated those issues?
A. So I took steps to get in to doctors right away in January and February. Again, it's Moscow, so it took some time. Throughout the spring and summer of 2023, I was just continually going in to doctors to try to find out what was happening, and there was not a lot of answers. I eventually sought massage therapy over the summer based on my doctor's advice, and then I was eventually able to get a referral for physical therapy.
Q. Between November of 2023, so the year after the murders, and today, were there things that you saw your primary care provider for that were associated with the symptoms you've just described and with the mental health struggles that you described earlier in your testimony?
A. Yes. I was going in on a pretty routine basis to work through all of our -- you know, all of the physical and mental issues I was having -- or I am having.
Q. Do you continue to experience any of those conditions?
A. Yes. They are ongoing daily.
Q. Finally, Professor Scofield, I'd like to talk to you about the financial impact and some of the out-of-pocket expenses that you have incurred with respect to some of the treatment that you've received to deal with the emotional trauma and the physical pain. Professor Scofield, I think you mentioned earlier you have insurance; is that right?

A. That is correct.
Q. And you had discussed insurance with Professor -- with Dean Quinlan; is that right?
A. Yes, particularly about therapy because we -- yeah, we have to find someone who'll take our insurance.
Q. And is it fair to say that for some of the expenses that you've incurred, insurance has paid a significant portion of that?
A. Yes, that's correct.
Q. All right. I'm first going to direct you to Exhibit 32, and Ms. Bibb will put it up on your screen, but it might also be easy to look at the book in front of you because it's a multipage exhibit. And if you'd go ahead and sort of page through those. And, Professor Scofield, do you recognize the documents that are within Exhibit 32?
A. Yes. These are receipts and explanation of benefits, EOBs, for physical therapy and other medical appointments related to the pain that I'm having.
Q. And are those physical therapy receipts and the receipts and explanation of benefit forms for services that you received from providers affiliated with Gritman Medical Center?
A. They are.
Q. I think you testified, but just to make sure, they relate to services you received in connection with both the pain and

C E R T I F I C A T E

I, ANNE BOWLINE, a Registered Merit Reporter and Certified Realtime Reporter, do hereby certify that I reported by machine shorthand the proceedings contained herein on the aforementioned subject on the date herein set forth, and that the foregoing 144 pages constitute a full, true, and correct transcript.

Dated this 20th day of May, 2026.

/s/ Anne Bowline

ANNE BOWLINE
Registered Merit Reporter
Certified Realtime Reporter

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

REBECCA SCOFIELD, Plaintiff, vs. ASHLEY GUILLARD, Defendant.

Case No. 3:22-CV-00521-REP

Volume II of IV

Boise, Idaho

February 25, 2026
8:29 a.m.

# TRANSCRIPT OF JURY TRIAL PROCEEDINGS

BEFORE THE HONORABLE RAYMOND E. PATRICCO
CHIEF UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff: MS. WENDY OLSON
MR. CORY MICHAEL CARONE
Stoel Rives, LLP
101 S. Capitol Boulevard, Suite 1900
Boise, Idaho 83702

For the Defendant: MS. ASHLEY GUILLARD
3262 Westheimer Rd, 942
Houston, Texas 77098

Court Reporter: MS. ANNE BOWLINE, RMR, CRR
Anne_Bowline@id.uscourts.gov

*Proceedings recorded by stenography; transcript produced by computer-aided transcription.*

# I N D E X


| PLAINTIFF'S WITNESSES | PAGE |
|---|---|
| REBECCA SCOFIELD | |
| Cross (Resumed) by Ms. Guillard | 153 |
| Redirect Examination by Ms. Olson | 183 |
| Recross-Examination by Ms. Guillard | 190 |
| ASHLEY GUILLARD | |
| Direct Examination by Ms. Olson | 197 |
| Cross-Examination by Ms. Guillard | 269 |
| Redirect Examination by Ms. Olson | 290 |
| KIM MAX RYTTER | |
| Direct Examination by Mr. Carone | 309 |
| Cross-Examination by Ms. Guillard | 316 |
| Redirect Examination by Mr. Carone | 327 |
| SEAN MICHAEL QUINLAN | |
| Direct Examination by Mr. Carone | 331 |
| Cross-Examination by Ms. Guillard | 345 |
| Redirect Examination by Mr. Carone | 354 |

| PLAINTIFF'S EXHIBITS | RECEIVED |
|---|---|
| 1 | 213 |
| 2 | 215 |
| 3 | 217 |
| 4 | 224 |
| 5 | 225 |
| 6 | 228 |
| 7 | 230 |
| 8 | 229 |
| 9 | 233 |
| 10 | 238 |
| 11 | 242 |
| 12 | 252 |

| | |
|---|---|
| 14A | 256 |
| 14B | 256 |
| 14C | 257 |
| 15B | 259 |
| 17 | 245 |
| 27 | 314 |
| 28 | 260 |
| 34 | 184 |
| 41 | 212 |
| 42 | 226 |
| 43 | 235 |

| DEFENDANT'S EXHIBITS | RECEIVED |
|---|---|
| 508 | 322 |
| 509 | 324 |
| 512 | 284 |
| 516 | 286 |
| 518 | 283 |
| 519 | 167 |

attention to Exhibit 41, which has not yet been admitted, so Ms. Bibb will pull up just the initial screen there. And, Ms. Guillard, from looking at this initial screen of Exhibit 41, do you recognize this as one of the TikToks that you posted?
A. It looks like one of the ones I posted.
Q. Well, Ms. Guillard, you had the opportunity to and you did review Exhibit 41 prior to trial; correct?
A. Correct.
Q. And you were able to tell that it is a TikTok video that includes you and you talking and talking about Professor Scofield; correct?
A. I did not bring my notes to stipulation as to whether this specific exhibit was authentic, but I did email you. So if I emailed you and said it was authentic, then yes.
Q. Ms. Guillard, I don't want you to be guessing up there, so I'm going to ask --
MS. OLSON: I don't know if we want to hand this to Mr. Gordon or --
THE COURT: Yes.
Q. (BY MS. OLSON) Would it help you to look at the email that you sent where you agreed to the authenticity of the exhibits?
A. Yes. Thank you.
THE COURT: And for the record, Ms. Guillard, if you

could just describe the date and the to and from of that email.

THE WITNESS: This email is dated February 24, 2026, 2:03 a.m., from Ashley Guillard, msashleyjt@gmail.com, to Mr. Carone, Ms. Olson, Ms. Bibb. It's titled "Defendant's Response to Plaintiff's Amended Exhibit List."

Q. (BY MS. OLSON) Ms. Guillard, would you please take a look at that and see if it refreshes your recollection as to whether Exhibit 41 is one that you stipulated as to authenticity.

A. Yes.

Q. And it is; correct?

A. Yes.

Q. And so Exhibit 41 is one of the TikToks that you made and you posted; correct?

A. Correct.

Q. Also on November 24, 2022; correct?

A. I don't know, but it looks to be that day based on the couch.

MS. OLSON: Your Honor, at this time I'd offer Exhibit 41.

THE COURT: Any objection, Ms. Guillard?

MS. GUILLARD: No objection.

THE COURT: Plaintiff's Exhibit Number 41 will be admitted and published if you wish.

(Plaintiff's Exhibit 41 received.)

MS. OLSON: Yes. We would request permission to play it for the jury.

THE COURT: You may.

(Playing video.)

Q. (BY MS. OLSON) All right. And, Ms. Guillard, that's the entire TikTok that you posted; correct?

A. Correct.

Q. And it appears to be from that same day because it's you in the same, I think, shirt, and it's the same picture of Professor Scofield that we looked at in Exhibit 40; is that right?

A. Correct.

MS. OLSON: And, Ms. Bibb, if you would please go to the initial screen of Exhibit Number 41.

Q. (BY MS. OLSON) And there are some words that appear on that initial screen; correct?

A. Correct.

Q. What do they say?

A. "Rebecca Scofield ordered the murder of Kaylee and Madison at the University of Idaho students."

Q. You put that type on the initial screen of your TikTok; is that correct?

A. That's correct.

Q. You decided what to say?

A. That's correct.
Q. All right. That was Exhibit Number 41.
Ms. Guillard, I'd like to next direct your attention to Exhibit Number 1. And if you'd look at the screen in front of you, Exhibit 1 is a TikTok that you posted on November 25, 2022; is that right?
A. I believe you.
Q. Well, you have in front of you, again, the document that we looked at earlier to refresh your recollection; is that right?
A. I -- I don't object to authenticity. I just cannot confirm that it was November 26 because I don't know.
Q. You don't remember the dates you posted these on; is that right?
A. Yes. And I didn't put the dates on my notes in your email.
MS. OLSON: Your Honor, at this time I'd offer Exhibit Number 1.
THE COURT: Any objection, Ms. Guillard?
MS. GUILLARD: No objection.
THE COURT: Plaintiff's Exhibit Number 1 will be admitted and published for the jury if you wish.
(Plaintiff's Exhibit 1 received.)
MS. OLSON: Yes, please, Your Honor.
And, Ms. Bibb, will you please play Exhibit Number 1.

(Playing video.)
Q. (BY MS. OLSON) And, Ms. Guillard, that's your voice in the TikTok; correct?
A. Correct.
Q. And this policy that we see there, the B policy, that's the same policy that we looked at yesterday in Exhibit 25; is that right?
A. Correct.
Q. And you chose to put this policy in with your TikTok; correct?
A. Correct.
Q. And you found it online; is that right?
A. Correct.
Q. And you say that she was worried about losing respect; correct?
A. Correct.
Q. And you would agree that that would be a natural outcome if someone was accused of having an affair with a female student; correct?
A. Pertaining to this -- no, that was not my intent regarding this video. I was saying she would lose respect for actually having -- being caught having a relationship with a student at that time, is what I believe. It wasn't about speculation or false statements at the time.
Q. Well, you knew at the time that as a consequence of the

Q. And that demand letter enclosed a copy of the earlier demand letter, the one that we looked at in Exhibit Number 19; correct?
A. Correct.
Q. And in that demand letter -- both demand letters -- it simply asked that you take down the videos; correct?
A. That was one of the things asked.
Q. And then it asked you to not post any more making the false statements; correct?
A. That was another thing that was asked.
Q. And then it asked to -- you to apologize; correct?
A. Correct.
Q. And you didn't take down the videos; correct?
A. Correct.
Q. And you kept making the videos; correct?
A. Correct.
Q. And you've never apologized to Professor Scofield; correct?
A. Correct.
Q. And you certainly didn't in response to that cease and desist letter in December of 2023 -- 2022; correct?
A. False. That was my response.
Q. Your response was --
A. The video.
Q. The video that ends with KMA?

A. Yes.

Q. If we could next look at Exhibit Number 43. And, Professor Scofield, do you recall watching Exhibit Number 43 prior to trial? I'm sorry. Ms. Guillard, did you watch Exhibit Number 43 prior to trial?

A. Yes.

Q. And it's another video that you made and posted on TikTok; correct?

A. Correct.

Q. And you made this one on or about December 13, 2022; correct?

A. That's possible.

Q. About the same time as the one we just looked at in Exhibit Number 9?

A. It looks like new clothes, so maybe a couple days later. They were around the same time.

MS. OLSON: Your Honor, at this time I'd offer Exhibit 43.

THE COURT: Any objection?

MS. GUILLARD: No objection.

THE COURT: Plaintiff's Exhibit Number 43 will be admitted and published for the jury.

(Plaintiff's Exhibit 43 received.)

Q. (BY MS. OLSON) And the screen that -- or the type that is on the screen on the first page of Exhibit Number 43, what

does that say?
A. It says, "Found a good place for the demand letter Rebecca Scofield's attorney sent me," upside-down smiley face.
Q. And you chose the words to put there; correct?
A. Correct.
MS. OLSON: Ms. Bibb, if you'd please play Exhibit 43.
(Playing video.)
Q. (BY MS. OLSON) And, Ms. Guillard, after receiving that demand letter and after you made the TikTok that's in Exhibit 9 and after you made the TikTok that's in Exhibit 43, you continued to post on TikTok making the false statements that Professor Scofield orchestrated the murders; correct?
A. That's possible.
Q. And you continued to post on TikTok making the false statements that Professor Scofield had had an affair with one of the murdered students; correct?
A. That's possible.
MS. OLSON: Your Honor, I don't know what time the Court plans to take the morning break. I know we've had a couple of times we've stepped out, but I'm fine with any time. I'm just alerting the Court that that would be --
THE COURT: If you have about another 15 minutes. Or if this is a better breaking time, we can break now.
MS. OLSON: No, Your Honor. I can keep going. I

just know we've been going for a while.

Q. (BY MS. OLSON) Ms. Guillard, I'm next going to have you look at Exhibit Number 10, and I'll direct your attention to the second page of Exhibit Number 10. And on Exhibit Number 10, Ms. Guillard, does that show the first screen of the TikTok that we looked at that's in Exhibit Number 6?

A. It appears to be.

Q. And you were aware when you were posting on TikTok that people could mark if they had liked your TikToks; correct?

A. Correct.

Q. And you could see if people had shared your TikToks; correct?

A. Correct.

Q. And it would also show the hashtags that had been selected for that content; correct?

A. Correct.

Q. And Exhibit Number 10 shows all of those things for the video -- the TikTok video we looked at in Exhibit Number 6; correct?

A. Correct.

MS. OLSON: Your Honor, at this time I'd offer Exhibit Number 10.

THE COURT: Any objection?

MS. GUILLARD: No objection.

THE COURT: Plaintiff's Exhibit Number 10 will be

A. I posted content on that day, correct.

Q. And it was the same murders that you had earlier repeatedly accused Rebecca Scofield of orchestrating; correct?

A. Correct.

Q. Ms. Guillard, do you know what year that photograph was taken?

A. I know -- I do not know what year that photograph was taken.

Q. 2019?

A. I may have known when I posted it, but right now I don't remember. It's possible that it was 2019.

Q. So some three years before the murders occurred; correct?

A. Possible.

MS. OLSON: You can take that down, Ms. Bibb.

Q. (BY MS. OLSON) Ms. Guillard, you were aware that the Moscow Police Department issued a press release on December 27, 2022, after this lawsuit was filed, where they said the professor who was suing the TikTok artist is not -- they don't believe that she's involved in the murders. Do you recall seeing that?

A. Yes.

Q. And that was what we looked at yesterday in Exhibit 21; is that right?

A. Yes.

Q. And you learned that Bryan Kohberger was arrested or taken

into custody at the end of December of 2022 or early January of 2023; correct?
A. Correct.
Q. That's the time frame you recall?
A. Correct.
Q. And you made statements after that accusing Professor Scofield of orchestrating the murders; correct?
A. Correct.
Q. And of doing so because she was having a relationship with one of the female students; correct?
A. Correct.
Q. I'm going to direct your attention to Exhibit Number 12. Some of the statements you made after Bryan Kohberger was arrested were made in a YouTube video that you posted on February 9, 2023, titled Full Synopsis of the Plot to Kill the Four University of Idaho Students; correct?
A. Correct.
Q. And Exhibit 12 is that Full Synopsis of the Plot to Kill the Four University of Idaho Students; correct?
A. It can be. It appears to be.
Q. Well, you had an opportunity to watch it prior to trial; correct?
A. The 12 I have is 12A, B, C. It's cut into three different videos. Is that what I'm looking at?
Q. No, Ms. Scofield -- Ms. Guillard. So prior to trial you

received Exhibit Number 12; correct?
A. Correct.
Q. And you had the opportunity to watch Exhibit Number 12; correct? The full video; correct?
A. Correct.
Q. And you are familiar with the full video; correct?
A. Correct. But I'm just confused because you have a 12A, B, and C.
Q. I'm not asking anything about those -- the email that you and I exchanged. I'm just asking you if you had an opportunity to view the full Exhibit Number 12, which is your Full Synopsis of the Plot to Kill the Four University of Idaho Students.
A. My exhibit, Defendant's -- my exhibit?
Q. No, our Exhibit Number 12.
A. And I'm asking you to clarify if 12 means A, B, and C, because I'm understanding that you have three 12s.
Q. I'm not asking you anything about anything that says 12A, 12B, or 12C. I'm not suggesting anything about that. I'm just asking you if you have been able to watch the full video that -- your Full Synopsis of the Plot to Kill the Four University of Idaho Students.
A. Correct.
MS. OLSON: Your Honor, at this time I'd offer Exhibit Number 12.

THE COURT: Any objection?

MS. GUILLARD: No objection.

THE COURT: All right. Plaintiff's Exhibit Number 12 will be admitted.

(Plaintiff's Exhibit 12 received.)

MS. OLSON: And I would ask that initially we put up the first page of Exhibit Number 12, but I only intend to play portions of it, Your Honor.

Q. (BY MS. OLSON) Ms. Guillard, in this YouTube video we see in Exhibit Number 12, dated February 9, 2023, you continued saying that Rebecca Scofield had a relationship with one of the female students; correct?

A. Correct.

MS. OLSON: Ms. Bibb, will you please play from approximately 2:43 to 4:45 in terms of the timestamp on it. I know it's a little hard to get there, so just a little more. 2:46.

(Playing video.)

MS. OLSON: And I think we actually stopped at 4:47, and I think it started at 2:46.

Q. (BY MS. OLSON) Ms. Guillard, in the video from February 9, 2023, the YouTube video that's Exhibit Number 12, you also continued saying that Rebecca Scofield came up with the plan to have the students killed; correct?

A. Correct.

MS. OLSON: Ms. Bibb, if you would next play from approximately 7:34 to 9:33. And if you can get it back to 7:25, that's fine.

(Playing video.)

MS. OLSON: If you would stop it there. We started at 7:25 and ended at 9:33.

Q. (BY MS. OLSON) And, Ms. Guillard, in your YouTube video that is Exhibit Number 12, the one you made on February 9, 2023, one of the changes you made about what you were posting is that you started including Bryan Kohberger in your posts; correct?

A. False.

Q. You started including Bryan Kohberger as having somehow been involved in the plan that Rebecca Scofield was putting together?

A. It wasn't a change. His name was mentioned, but I had already mentioned another culprit November 23, 2022.

Q. That --

A. The change was saying his name specifically.

MS. OLSON: If you'd now play from approximately -- Ms. Bibb, from 24:43 to 29:14.

(Playing video.)

MS. OLSON: We went from 24:43 to 29:14. You can take Exhibit Number 12 down now, Ms. Bibb.

Q. (BY MS. OLSON) Ms. Guillard, you learned that Bryan

Kohberger was charged by way of indictment on May 16, 2023; correct?
A. False.
Q. You didn't learn about him being charged with the murders?
A. Not arrested but being charged?
Q. Correct.
A. I don't know what day.
Q. You learned that he was being charged; correct?
A. Correct.
Q. And after he was charged that formal way, you knew that he alone was charged; correct?
A. Correct.
Q. And you learned that no other person was ever charged along with Bryan Kohberger; correct?
A. Correct.
Q. And you made statements after May 16, 2023, accusing Professor Scofield of orchestrating the murders; correct?
A. I would have to see that. It's possible.
Q. You appeared on a YouTube program called The Nerd Report on June 9, 2023?
A. Yes.
Q. You did an interview with the hosts?
A. Yes.
Q. You were sitting in a Maserati vehicle; correct?
A. Correct.

Q. I'm next going to direct your attention to Exhibit Number 14. Ms. Guillard, did you watch Exhibit Number 14 prior to trial?
A. A little bit of it.
Q. You watched certain excerpts of it?
A. A little bit.
Q. And you recognized it as the -- your appearance on the YouTube program called The Nerd Report on June 9, 2023; correct?
A. Correct.
MS. OLSON: Your Honor, we're not going to offer all of Exhibit 14. I'm going to offer Exhibit 14A.
Q. (BY MS. OLSON) Do you recall looking at Exhibit 14A, Ms. Guillard?
A. I looked at 14A.
Q. And that is a true and accurate excerpt of your appearance on The Nerd Report on June 9, 2023?
A. Well, it's edited, but yes.
Q. It's just an excerpt; right?
A. Yes.
Q. And it's just a part of a larger video; correct?
A. Correct.
Q. But it's a true and accurate excerpt of that larger video; correct?
A. True and accurate in the sense that it's me saying those

words?

Q. Yes.

A. Correct.

MS. OLSON: Your Honor, at this time I'd offer Exhibit 14A.

THE COURT: Any objection, Ms. Guillard?

MS. GUILLARD: No objection.

THE COURT: Plaintiff's Exhibit 14A will be admitted and published to the jury.

(Plaintiff's Exhibit 14A received.)

(Playing video.)

Q. (BY MS. OLSON) And, Ms. Guillard, did you also watch Exhibit 14B prior to trial, another excerpt from your June 9, 2023, appearance on The Nerd Report?

A. Yes.

Q. And is 14B a true and accurate excerpt of another portion of your appearance on The Nerd Report?

A. Yes.

MS. OLSON: Your Honor, at this time I'd offer Exhibit 14B.

THE COURT: Any objection?

MS. GUILLARD: No objection.

THE COURT: Plaintiff's Exhibit 14B will be admitted and published.

(Plaintiff's Exhibit 14B received.)

(Playing video.)

Q. (BY MS. OLSON) Ms. Guillard, did you also watch Exhibit 14C prior to trial?

A. Yes.

Q. And that's also an excerpt from your appearance on The Nerd Report on June 9, 2023?

A. Yes.

MS. OLSON: Your Honor, at this time I'd offer Exhibit 14C.

THE COURT: Any objection?

MS. GUILLARD: No objection, Your Honor.

THE COURT: Plaintiff's 14C will be admitted and published.

(Plaintiff's Exhibit 14C received.)

(Playing video.)

Q. (BY MS. OLSON) Ms. Guillard, you also made a YouTube video and posted it to your YouTube channel on October 14, 2023, where you referred to Professor Scofield as a murderer; correct?

A. October --

Q. 14th of 2023.

A. It's possible.

Q. And you had over 1,000 subscribers to your YouTube channel; correct?

A. Yes.

Q. Do you recall watching Exhibit 15B prior to trial?
A. Yes.
Q. And is that an excerpt from an October 14, 2023, YouTube video that you made?
A. Is it possible for me to see it before I answer that question?
Q. Sure.
MS. OLSON: Ms. Bibb, if you would please pull up the first part of Exhibit 15B.
A. Yes.
Q. (BY MS. OLSON) And that's a post that you made on your YouTube channel on October 14, 2023; correct?
A. Correct.
Q. And that post on the YouTube channel, that's one where you refer to Professor Scofield as a murderer; correct?
A. I would have -- I don't remember. I would have to see the video again.
Q. Do you recall watching Exhibit 15B?
A. I watched it as well as all of the other videos. I don't recall whether I referred to her as a murderer.
Q. Exhibit 15B is an excerpt of a YouTube video that you posted; correct?
A. Correct.
MS. OLSON: Your Honor, at this time I'd offer Exhibit 15B.

THE COURT: Any objection?

MS. GUILLARD: No objection.

THE COURT: Plaintiff's Exhibit 15B will be admitted and published for the jury.

(Plaintiff's Exhibit 15B received.)

(Playing video.)

Q. (BY MS. OLSON) So, Ms. Guillard, would you agree that in that excerpt from your October 14, 2023, YouTube video, that you referred to Professor Scofield as a murderer?

A. Yes.

MS. OLSON: You can take that down, please, Ms. Bibb.

Q. (BY MS. OLSON) Ms. Guillard, by December 21, 2023, you knew that the University of Idaho had no evidence or information that Professor Scofield had ever communicated with any of the students who were murdered; correct?

A. False.

Q. You reached out to the University of Idaho; correct?

A. Yes.

Q. You sent them a subpoena; correct?

A. Correct.

Q. And you received a response to that subpoena; correct?

A. Correct.

Q. And it came from Kim Rytter; correct?

A. Correct.

Q. He's the general counsel for the University of Idaho?

A. Correct, from my understanding.
Q. And if I could direct your attention to Exhibit 28. Ms. Guillard, do you recognize Exhibit 28 as the response that you received from the University of Idaho regarding -- in response to your inquiry about Professor Scofield's contact with the students?
A. Yes.
Q. And you agree that this is a true and accurate copy of that?
A. I believe so.
Q. Do you recall receiving it?
A. Yes.
MS. OLSON: All right. Your Honor, at this time I'd offer Exhibit 28.
THE COURT: Any objection?
MS. GUILLARD: No objection.
THE COURT: Plaintiff's 28 will be admitted and published for the jury.
(Plaintiff's Exhibit 28 received.)
Q. (BY MS. OLSON) And, Ms. Guillard, this letter's dated December 21, 2023; correct?
A. Correct.
Q. It's addressed to you by email; correct?
A. Correct.
Q. And it starts out, "Dear Ms. Guillard, this correspondence

Q. So you didn't do any due diligence to see whether or not she was in Moscow, Idaho, when the murders occurred; correct?
A. Correct.
Q. And you didn't do any due diligence to see if she even knew the young man that she hired; correct?
A. Are you speaking on November 24, or are you speaking after?
Q. On November 24, before you posted anything that connected her to that young man, what due diligence did you do -- before or after your tarot card readings, what due diligence did you do to see if Professor Scofield had any relationship with that young man?
A. All I did was a tarot and oracle card reading.
Q. So you didn't look to see if there were any facts to confirm that tarot card reading?
A. No. I mean, I looked -- other than looking up the University of Idaho website, no.
Q. And when you looked on the University of Idaho website, you picked out Rebecca Scofield; correct?
A. False. I told you I looked up and did a reading on each and every person that was on that web page, and the rest of them, my tarot reading revealed or stated the message was they were not involved, and my tarot reading on Rebecca Scofield stated that she was involved.
Q. And after that you did no due diligence to find any facts

to see if your tarot card reading in fact had facts to back it up so that if you were going to accuse somebody of a crime, that was evidence that could be used in the process; correct?
A. That was the point of my tip to the FBI, because I believe they are the factfinders in criminal cases, or in this case the Moscow Police Department, not the public.
Q. Well, you posted your TikToks, I think a significant number, 15, on November 24; correct?
A. Correct.
Q. And then multiple the next day, on November 25; correct?
A. About -- generally about the murders.
Q. And about Professor Scofield. You alleged that she had orchestrated them; correct?
A. And some of them were about Rebecca Scofield.
Q. And some of them were about Rebecca Scofield having had a relationship with one of the students; correct?
A. Correct.
Q. And there were as many as ten on November 28, 2022; correct?
A. Regarding the murder of the four students generally and Rebecca Scofield?
Q. You posted ten videos on November 28, 2022, about the videos and Professor Scofield's involvement in them; correct?
A. All of the videos were not about Rebecca Scofield, but, yes, some of the videos were.

Q. And the only person you ever named in any of your TikToks that you alleged orchestrated the murders was Rebecca Scofield; correct?
A. Correct.
Q. And in all of the videos that you did, the only person that you ever said actually murdered the students was the young man who is in those videos; right?
A. Correct.
Q. And you never posted a video saying that Bryan Kohberger actually committed the murders; correct?
A. I never said that.
Q. Ms. Guillard, you've talked about your FBI tip line. Let's take a look at that. I think it's Exhibit 512.
MS. OLSON: And, Your Honor, I think that's in evidence, so if it may be published.
THE COURT: It may.
Q. (BY MS. OLSON) Ms. Guillard, if we go to the very upper right-hand corner, this is an email that you sent; correct?
A. Correct.
Q. And it's dated Saturday, December 10, 2022, at 3:54 a.m.; is that right?
A. Correct.
Q. And that was more than two weeks after you first started posting TikToks stating that Rebecca Scofield had orchestrated the murders; correct?

A. Correct.
Q. And that was more than two weeks after you had posted on TikTok that Professor Scofield was having a relationship with a female student; correct?
A. Correct.
Q. And between November 24 and December 10, 2022, what facts had you gathered to show that Professor Scofield was in any way involved in the murders?
A. Again, as a -- they call it psychic. I say claircognizant. We work with intuition, not facts.
Q. But when you were on TikTok, you were stating as a matter of fact that Professor Scofield was the murderer; correct?
A. False. In my TikToks I'm holding up tarot and oracle cards, which would imply it is a tarot and oracle card reading, which is not a fact.
MS. OLSON: If we could please look at Exhibit Number 40.
Q. (BY MS. OLSON) Ms. Guillard, you remember Exhibit Number 40?
A. Yes.
MS. OLSON: Could we please play Exhibit Number 40.
(Playing video.)
Q. (BY MS. OLSON) All right. Ms. Guillard, there's no reference to a tarot card in Exhibit 40; correct?
A. False. My channel was a reference to tarot and oracle

card readings because that is what my channel on TikTok was used for.
Q. That wasn't my question, Ms. Guillard.
A. So, no, that's false because I posted that in a forum that I posted tarot and oracle card readings.
Q. Ms. Guillard, Exhibit Number 40, you chose what to say in that video; correct?
A. Correct.
Q. And not once in that video do you refer to a tarot card reading or an oracle card reading; is that right?
A. Correct.
Q. Let's go back to Exhibit 512. Exhibit 512 is your FBI tip line sent more than two weeks after you first started posting your TikToks; correct?
A. Correct.
Q. And in this tip line, is there a place where you say -- where you tell whoever you're sending this to, "Hey, I got this through an oracle card reading or a tarot card reading"?
A. No.
Q. You just provide what you set out here as facts; correct?
A. As a tip.
Q. Right. Well, you assert in the very first line, "Co-Conspirators: Rebecca Scofield ordered the execution of," and then you list two students; correct?
A. Correct.

Q. At that time did you ever have any facts that the young man you identified had ever been at the house on King Road on November 12th or 13th or 2022?
A. By "fact," do you mean did I have any documents or --
Q. I understand you said you had your tarot or oracle card readings; correct?
A. Correct.
Q. And you said that you know that tarot and oracle card readings are not facts that can be used to prosecute someone; correct?
A. Correct.
Q. So my question is, do you have any facts that that young man had been at the house on November 12 or 13, setting aside your tarot card readings, any facts?
A. The online information that he was her ex-boyfriend would imply that he was at their house, but I had not seen him personally in that house.
Q. And you hadn't seen any fact, any report, anything, including in that November 30 press release that we looked at in Exhibit 518, that would suggest that that young man had ever been at the house; correct?
A. False.
Q. And you don't present -- in Exhibit 512 you don't present any of this on the tip line as having been from a tarot card reading; correct?

A. It's not required. We don't have to tell them where we get our tips from.
Q. Well, you didn't tell them that; right?
A. Correct.
Q. You asserted certain things and provided that as your tip that you wanted them to follow up on?
A. Investigate. I wanted them to investigate them at least.
Q. And at the time I take it you didn't know that Professor Scofield had called the police department on November 24, 2022; correct?
A. Correct.
Q. And you didn't know that she had periodically after that called the police department to update the police department; correct?
A. I have no knowledge of that.
Q. And you didn't make any effort to find out any of those facts; correct?
A. The facts is the job of law enforcement, not a psychic.
Q. With respect to Exhibit 518, that press release that we looked at, Exhibit 518 doesn't have a single fact in it that refers to Professor Scofield or a history professor or anyone having ordered the murders; correct?
A. I don't believe so.
Q. And Exhibit 516, that probable cause statement that you say you got on December 29, 2022, the probable cause statement

that you got through public records, that doesn't say a single thing or have a single fact in it that in any way suggests that Professor Scofield was involved in the murders; correct?
A. Correct.
Q. And it doesn't have any information in it to suggest that anyone other than Bryan Kohberger was involved in the murders; correct?
A. False.
Q. Bryan Kohberger's the only person that it identifies as having been involved in the murders; correct?
A. Correct. But this says -- described as a figure a five-ten or taller male, could be anybody five-ten or taller, that's a male, and not very muscular.
Q. With bushy eyebrows?
A. With bushy eyebrows.
Q. And have you seen pictures of Bryan Kohberger?
A. After the arrest, yes.
Q. And he has -- he was tall and thin; correct?
A. I don't have an opinion on that.
Q. He had a lean build; correct?
A. I don't have an opinion on that.
Q. And he had bushy eyebrows; correct?
A. I don't have an opinion on that.
Q. And he had dark hair; correct?
A. I don't have an opinion on his looks.

C E R T I F I C A T E

I, ANNE BOWLINE, a Registered Merit Reporter and Certified Realtime Reporter, do hereby certify that I reported by machine shorthand the proceedings contained herein on the aforementioned subject on the date herein set forth, and that the foregoing 217 pages constitute a full, true, and correct transcript.

Dated this 20th day of May, 2026.

/s/ Anne Bowline

ANNE BOWLINE
Registered Merit Reporter
Certified Realtime Reporter

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

---

REBECCA SCOFIELD,
Plaintiff,
vs.
ASHLEY GUILLARD,
Defendant.

Case No. 3:22-CV-00521-REP
Volume III of IV
Boise, Idaho
February 26, 2026
8:29 a.m.

---

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

BEFORE THE HONORABLE RAYMOND E. PATRICCO
CHIEF UNITED STATES MAGISTRATE JUDGE

---

APPEARANCES:

For the Plaintiff: MS. WENDY OLSON
MR. CORY MICHAEL CARONE
Stoel Rives, LLP
101 S. Capitol Boulevard, Suite 1900
Boise, Idaho 83702

For the Defendant: MS. ASHLEY GUILLARD
3262 Westheimer Rd, 942
Houston, Texas 77098

Court Reporter: MS. ANNE BOWLINE, RMR, CRR
Anne_Bowline@id.uscourts.gov

*Proceedings recorded by stenography; transcript produced by computer-aided transcription.*

# I N D E X


| JURY INSTRUCTIONS | PAGE |
|---|---|
| jury instruction conference | 585 |

| PLAINTIFF'S WITNESSES | PAGE |
|---|---|
| REBECCA J. TALLENT | |
| Direct Examination by Mr. Carone | 367 |
| Cross-Examination by Ms. Guillard | 375 |
| REBECCA BOHN | |
| Direct Examination by Ms. Olson | 390 |
| Cross-Examination by Ms. Guillard | 408 |
| Redirect Examination by Ms. Olson | 466 |
| CHRISTOPHER HANSON | |
| Direct Examination by Mr. Carone | 470 |
| Cross-Examination by Ms. Guillard | 487 |
| Redirect Examination by Mr. Carone | 504 |
| JOHN JOSEPH THOMAS CARLSEN | |
| Direct Examination by Mr. Carone | 510 |
| Cross-Examination by Ms. Guillard | 526 |
| MARGIE ELENA SCOFIELD | |
| Direct Examination by Ms. Olson | 559 |
| Cross-Examination by Ms. Guillard | 576 |
| Redirect Examination by Ms. Olson | 583 |

| PLAINTIFF'S EXHIBITS | RECEIVED |
|---|---|
| 13 | 483 |
| 37 | 520 |

| DEFENDANT'S EXHIBITS | RECEIVED |
|---|---|
| 501 | 420 |

| MOTIONS | PAGE |
|---|---|
| motion to excuse Juror Number 5 | |
| Ms. Guillard | 552 |
| Ms. Olson | 552 |
| the Court | 553 |

MR. CARONE: Okay. Ms. Bibb, can you please pull up Exhibit Number 40.
And, Your Honor, this is one that has already been admitted. May it be published?
THE COURT: It may be published.
(Playing video.)
Q. (BY MR. CARONE) Mr. Hanson, is Exhibit 40 one of the ones you saw on Thanksgiving of 2022?
A. Yes, it is. This is the first video that I saw.
Q. Could you tell if people were watching the video?
A. Yes, I could.
Q. How could you tell?
A. On TikTok there's icons for how many views a video has. There's an icon for how many likes a video has. There's an icon for how many comments a video has. So I could see that it had many likes, and I could see that it had quite a lot of views.
Q. And you mentioned that there were other videos you watched on Thanksgiving as well?
A. Yes.
MR. CARONE: Ms. Bibb, can you please pull up Exhibit Number 41.
Your Honor, this one has also been admitted already.
THE COURT: Thank you. It may be published.
(Playing video.)

Q. (BY MR. CARONE) Mr. Hanson, was that another video you saw on Thanksgiving Day 2022?
A. Yes, it was.
Q. Could you tell if this video was being watched in the same way as Exhibit Number 40 was?
A. Yes, I could, and it was.
Q. Were you afraid for Professor Scofield at this point?
A. I was very afraid for her.
Q. Why?
A. I could tell how many people were viewing it. I could tell how far the reach was based on how many people were viewing it. And in this time period -- this was two weeks after the murders had occurred, I believe -- the amount of online sleuthing about this murder case and speculation by the public online, I had been aware of it, and these videos caused me to start monitoring a lot of the discussion online about this.
And I saw how disturbing some of the discussions were, how many accusations were flying, how many people's lives were being investigated by people online from out of state, around the world, everywhere. People were paying attention to this case, and the amount of attention that it was getting scared me with these videos, in my view, putting a target on Becca.
Q. After Thanksgiving day 2022, did you start tracking

Ms. Guillard's posts about Professor Scofield?

A. Yes. Especially then I was tracking it multiple times a day. I would go into her account and view the videos, take screenshots, save the videos. This was kind of my own coping mechanism in a way that was also a way to help Becca. This was a situation that felt so out of our control, out of my control.

This was my method of trying to help and do something, to track the online discussion and just know what's happening and know if there's something especially threatening, especially scary. Because the online -- the online ecosystem around this was just kind of furious at that time. There was so little information from the police about the murder investigation that online discussion was basically filling the void, and creators like Ms. Guillard were happy to provide videos to fill that void.

Q. Okay. And focusing on this kind of November-December 2022 time frame, how many videos was Ms. Guillard posting about Professor Scofield?

A. It would sometimes be 10 to 15 a day. It seemed like it was at least once a day. Because this was a time where the news cycle was just absolutely rampant for more, looking for more information. People online, people on TikTok were looking for more information.

Q. Would you report to Professor Scofield each time there was

a new video or post?
A. I would report the ones I found especially threatening or scary.
Q. About how many times would you report something to Professor Scofield because it was particularly concerning or scary?
A. I would say in the period immediately after, it was probably three or four times a week I would specifically bring up a specific video that Ms. Guillard had posted.
Q. Did you notice anything about Professor Scofield's tone or demeanor when you would make these reports to her?
A. Yeah. She was very distraught about it. She was very scared. She sounded -- she just sounded very scared, and this was basically the entirety of what we would talk about. We used to talk about our weeks. We used to talk about work, relationships, and just normal everyday things. And this is all we would talk about because it was scary and it was so far outside of our control.
Q. Around this time -- again, November-December 2022 -- were you aware of any theories online about an ex-boyfriend being involved with the murders?
A. Yes.
MR. CARONE: And, Your Honor, I'm not going to play it just for sake of time, but I'd like to publish just the opening screen of Exhibit Number 2, which has already been

admitted into evidence.

THE COURT: You may.

Q. (BY MR. CARONE) Mr. Hanson, can you please just read the text on that first screen aloud for the jury.

A. "The two people who partnered to kill the four University of Idaho students: Rebecca Scofield and Jack DuCoeur."

Q. Do you know who Jack DuCoeur was -- or is? Excuse me.

A. I'm aware of who he is.

Q. Who is he?

A. He was an ex-boyfriend of one of the victims of the murders.

Q. From what you were seeing, was Ms. Guillard taking an existing theory that was online and then connecting Professor Scofield to that theory?

A. Yes, she was. There was a lot of speculation that I saw about Jack DuCoeur online, so there were other creators making videos that implicated him as well.

MR. CARONE: Next, Your Honor, I'd like to publish Exhibit Number 10, which has already been admitted into evidence.

THE COURT: You may.

MR. CARONE: And, Ms. Bibb, can you go to the second page. Can you focus in on the hashtags, Ms. Bibb.

Q. (BY MR. CARONE) I should back up first. Mr. Hanson, do you recognize Exhibit 10?

A. Yes, I do.
Q. Is that a screenshot of a video that you saw back in November or December of 2022?
A. Yes, it is.
Q. I'd like to direct your attention to the hashtags. Do you see that there's a hashtag "Rebecca Scofield"?
A. Yes.
Q. Is this a hashtag specifically for content about Professor Scofield at this time?
A. Yes, it is. The hashtags on the TikToks are a way to organize the content for users who use the platform. There was a lot of material on the website about the Idaho murders, so other hashtags here were to connect these videos with other content that was being made about the murders that happened. Rebecca Scofield's name was being added into this.
Something that I was tracking at the time was you could click on the hashtags and see how many views were associated with videos that had that hashtag. I believe Ashley Guillard was the only person putting hashtag "Rebecca Scofield" on her videos. And if I recall, by December 1 there were a million views on the videos that fell under hashtag "Rebecca Scofield."
MR. CARONE: You can take down Exhibit 10, Ms. Bibb.
Q. (BY MR. CARONE) Mr. Hanson, do you remember when Bryan Kohberger was arrested for the murders at the University of

Idaho?
A. Yes, I do.
Q. Do you remember the date he was arrested?
A. December 30.
Q. And did Ms. Guillard's videos ever mention Bryan Kohberger prior to his arrest?
A. No, they did not.
Q. I said December 30. December 30th of 2022.
A. 2022.
Q. Did Ms. Guillard start mentioning Bryan Kohberger after his arrest?
A. Yes, she did.
Q. Were those videos also about Professor Scofield?
A. Yes.
Q. Can you maybe elaborate on what you were perceiving about how Ms. Guillard was connecting Rebecca Scofield to Bryan Kohberger.
A. Yeah. So when the news of Bryan Kohberger's arrest came out, Ashley Guillard would incorporate new material that was known in the news cycle into her videos because these would be the current issues being discussed online. These would be the popular issues. Obviously, when Bryan Kohberger was arrested, this was a huge change in the news story of this murder and the investigation. So in the videos Ashley Guillard incorporated into her narrative a story about how Bryan

Kohberger was somewhat involved in the murder plot that she had been fabricating but ultimately was not the one that committed the murder.
Q. Okay. Was Ms. Guillard connecting Professor Scofield to Bryan Kohberger in the same way she had connected Professor Scofield to Jack DuCoeur back when that was kind of the hot topic online?
A. Yes, she was. She claimed that they had had a contact with one another.
Q. And I know we've watched a couple videos or at least some screenshots of videos. Is that everything that Ms. Guillard posted about Professor Scofield?
A. No, not at all.
MR. CARONE: Your Honor, this exhibit's not yet been admitted, but I'd like to present to Mr. Hanson Exhibit Number 13.
Q. (BY MR. CARONE) Mr. Hanson, do you recognize Exhibit Number 13?
A. Yes, I do.
Q. What is Exhibit Number 13?
A. Exhibit Number 13 is a number of screenshots of videos, each screenshot representing one of the videos that Ms. Guillard posted, also including the date that it was posted on to TikTok.
Q. Did you personally watch all of the videos that are

included on this chart in Exhibit Number 13?
A. Yes, I did.
Q. How do you know that?
A. I watched all of the content that she had posted on her TikTok account from the time that Becca had called me and going back to previous content as well on her account.
Q. And do you see that there are file names on the left side of the chart?
A. Correct, yes.
Q. Were those files that you had had the opportunity to watch those videos prior to this trial --
A. Yes.
Q. -- to make sure they were the videos you saw back in November and December of 2022?
A. Yes, I did.

MR. CARONE: Your Honor, at this time I'd move to admit Exhibit Number 13 as a demonstrative exhibit under Rule 1006.

THE COURT: So you're admitting it because the videos that it summarizes are too voluminous to present here in court?

MR. CARONE: Yes, Your Honor.

THE COURT: And are they all videos made by -- or attributable to Ms. Guillard?

MR. CARONE: Yes, Your Honor.

THE COURT: So they've been available to her?

MR. CARONE: Correct, Your Honor. I think yesterday she said she has them all, all her videos, on her phone still.

THE COURT: Ms. Guillard, any objection to Plaintiff's Exhibit Number 13?

MS. GUILLARD: No objection.

THE COURT: All right. Plaintiff's Exhibit Number 13 will be admitted under the rule of evidence 1006 as a demonstrative exhibit.

(Plaintiff's Exhibit 13 received.)

MR. CARONE: May I publish it, Your Honor?

THE COURT: You may.

Q. (BY MR. CARONE) Mr. Hanson, how many pages are there on Exhibit Number 13?

A. There are 57 pages, I believe. 58 pages.

Q. 58 pages.

MR. CARONE: And, Ms. Bibb, you can just show a couple of the earlier pages for the jury.

Q. (BY MR. CARONE) And so except for the last page that has one video, do each of those, I guess, 57 -- remaining 57 pages follow this format of two videos and two files?

A. That's correct.

Q. So how many videos in total are there on the chart?

A. I believe that meant it was 115.

Q. 115 videos.

And you said earlier that the information on the left is the name of the video -- the file name of the video?
A. That's correct.
Q. And the information in the central column is the date the video was posted?
A. Yes.
Q. And then the information on the right is the opening, like, thumbnail or screenshot of the video itself?
A. Yes.
Q. What date do the TikToks videos on Exhibit 13 end? I think that's going to be on page 57.
A. I believe it's in August of --
Q. What's the date of that last video on page 57?
A. The date is 12/19/2022.
Q. And Ms. Guillard started posting on November 24, 2022?
A. That's correct.
Q. So between November 24, 2022, and December 19, 2022, there's 114 videos that she posted?
A. That's correct.
Q. Are the videos or the screenshots of the videos on Exhibit 13 all of the videos that Professor -- that Ms. Guillard posted about Professor Scofield?
A. No. This is just a subset of them.
Q. And then what platform was the last video on Exhibit 13 posted on?

A. The last one is from YouTube.
Q. Did Ms. Guillard eventually start posting on YouTube instead of TikTok?
A. Yes, she did.
Q. For how long did Ms. Guillard continue to post on YouTube about Professor Scofield?
A. I believe it's until August of last year.
Q. August of 2025?
A. That's correct.
Q. Okay. Could it be later than that? That's just the last one you remember?
A. That's the last one I remember.
Q. I think I misspoke earlier. Is the date of the first video on Exhibit 13 November 23, 2022?
A. Yes, it is.
Q. I think I said November 24, so I apologize for that.
Obviously, a lot of videos that you've seen of Ms. Guillard are about Professor Scofield. What effect have you seen those videos have on Professor Scofield?
A. The sort of unceasing nature of them really seemed to wear down Becca. When we would talk, I would bring up -- there were periods of time where Ms. Guillard would stop posting but would then restart again. It was never predictable when she would be posting. And so I would see this unpredictability and this ultimately unceasing nature of these videos wear

Guillard?
A. This threat came directly after your videos were posted.
Q. How did you know when the threat came if you did not see it?
A. Because Becca told me about it.
Q. Your testimony is now that Professor Scofield told you about an email she received?
A. Yes.
Q. And that it came after the videos; correct?
A. Yes.
Q. But there's no correlation between me and this person who's a vigilante; correct?
A. I don't know who it came from, so, no, I don't know what the connection would be between you and the person that sent this, other than they probably viewed your videos.
Q. But you don't know the person; correct?
A. Correct.
Q. So you don't know what they know; correct?
A. No.
Q. Do you know their motivations? Correct? You don't know their motivations; correct?
A. No, I do not know their motivations.
MS. GUILLARD: Thank you. No further questions.
THE COURT: Any redirect?
MR. CARONE: Yes, Your Honor. And the evidence needs

to be moved back over to Ms. Bibb, please.

Ms. Bibb, can you please pull back up Exhibit 13.

Your Honor, may I publish it to the jury?

THE COURT: You may.

REDIRECT EXAMINATION

BY MR. CARONE:

Q. Mr. Hanson, you remember the questions you received from Ms. Guillard about Exhibit Number 13?

A. Yes.

Q. Okay. And the first video, you described that as a video where Ms. Guillard said that she had solved the murder?

A. Yes.

Q. Was it kind of like a teaser for videos to come?

A. Yes. It was the first video in the series that she was going to be starting to do.

Q. Okay. And then the second video, is that then the first video that you saw of Professor Scofield that Ms. Guillard posted?

A. I think it's one of the first two videos.

Q. And that was the day after she had posted this teaser about solving the murders?

A. Yes.

Q. Did Ms. Guillard go on to continually post videos about the Idaho murders and her theories about those murders?

A. Yes, she did.

Q. Did many of those videos reference Professor Scofield directly?
A. Yes.
Q. And when the videos did not directly reference Professor Scofield, were they still part of this ongoing series that Ms. Guillard was publishing on a daily basis?
A. Yes.
Q. And for those videos Ms. Guillard was using the hashtag "Rebecca Scofield"?
A. Yes.
Q. Regardless of whether the video directly referenced Professor Scofield or not?
A. That's correct.
Q. And this was all part of Ms. Guillard creating content and getting attention for her page?
A. That's right.
Q. In your view, did Ms. Guillard put a spotlight on Professor Scofield that did not exist prior to November 24, 2022?
A. I'm sorry. Can you state that first part of that.
Q. Yeah. I'm just trying to understand, in your view, did Ms. Guillard's posts put a spotlight on Professor Scofield?
A. Yes. They absolutely did. They included her picture. They included her address at work. They included information about her and spun out a fabricated story about her.

Q. And that spotlight was in relation to the murder of the four University of Idaho students?
A. Yes.
Q. And the spotlight was put on Professor Scofield at a time when there was a lot of fear and uncertainty about what had happened or who the killer was?
A. Absolutely, yes.
Q. Is that why you were afraid for Professor Scofield?
A. Yes, I was.
MR. CARONE: No further questions, Your Honor.
THE COURT: All right. Thank you. May the witness be excused?
MR. CARONE: Yes, Your Honor.
THE COURT: Thank you, Mr. Hanson.
Ms. Olson, I think now's a good time for our next comfort break. I know the jury's been sitting for a while, so we'll take five to ten minutes now for a comfort break, and then we'll return. So the jury may be excused.
(The jury exited the courtroom at 12:41 p.m.)
THE COURT: Please be seated.
Ms. Olson, who is the next witness?
MS. OLSON: Your Honor, the next witness will be John Carlsen. Mr. Carone is going to do that examination. And then our last witness will be Margie Scofield, and I'll be doing that examination.

focused on family. That's why we moved back to Idaho. I feel like she has always had really good balance in her life between work and family. But at that point, you know, she was very, very professionally focused, very driven, very interested in making sure that she was performing to her own expectations and being in the top of her field while at the same time, you know, raising two kids. We had two kids under five at that point, which is wild being far from family. So, yeah, real good balance.

Q. Are your families still living in Emmett?

A. They both are.

Q. And does Professor Scofield make it a point to keep in touch with everyone in Emmett while you guys are living in Moscow?

A. Oh, yeah.

Q. How does she do that?

A. She talks to her parents on the phone almost every day, and we go to Emmett and the Boise area often, and a lot of people come up to see us as well.

Q. Prior to November 2022, did you observe your wife experience stress or anxiety related to work?

A. Nothing out of the ordinary. You know, everybody who's really dedicated to their career has stressful moments, but Becca's always really used them as motivation to kind of drive her to excellence. I think, you know, nothing that was ever

really detrimental to her health or family, just what she used to drive herself professionally and get fulfillment out of her career.
Q. Were you living in Moscow in November 2022, when Bryan Kohberger murdered four students?
A. Yes.
Q. Was there a lot of information about the murders right after they occurred?
A. No.
Q. Was there a lot of fear in the Moscow area?
A. Yes.
Q. With that combination of fear and a lack of information, did you observe the community responding to theories on the Internet about the murders?
A. Yeah. I mean, there was really no other source of information besides whatever you could find scouring the Internet at that point. Law enforcement was very tight lipped, and nobody knew anything, and everybody really wanted to know what was going on. So that was kind of one of the only sources of information.
Q. Can you remember any examples of how the community was responding to theories online?
A. Yeah. I mean, obviously the kids -- the roommates who were in the house and the ex-boyfriend were really getting a lot of attention, and people were coming up with theories

about them. And then there was all the way to, like, hoodie guy at the food truck. People were trying to find this guy in a white hoodie because somebody saw him on a video. Everybody was, like, trying to find something to point to.

Q. Do you remember Thanksgiving Day in November 2022?

A. I do.

Q. Was that the day you first saw Ms. Guillard's posts about your wife?

A. Yes.

Q. Did you watch the post first?

A. I did.

Q. What do you remember about that?

A. We were out on a walk, my sister and Becca and all of our kids, and she checked her work email while we were out. And someone had forwarded one of the videos to her, and she asked me to review it just to make sure it wasn't spam or something that she shouldn't open on her phone. And I watched the video and saw what was in it and said, "No, I don't think it's spam, but I don't think you should watch it."

Q. Did she then go on to watch the video?

A. At some point later she did with my sister, yeah.

Q. What did you observe about your wife after she first watched the video?

A. She was very distracted the rest of the day, very distraught. You know, it's Thanksgiving Day. It's difficult

to not be engaged with family. But she -- she was very kind of taken out of the moment in the holiday and, you know, reviewing the video a couple other times, talking with my sister, who she shared it with.

Q. I want to focus kind of on the November-December 2022 time frame. Did you observe your wife seeming afraid during that time?

A. Absolutely, yeah. I mean, I think, you know, we -- she reached out to the university soon, I think the same day, and I believe they got her picture taken off the history department page. She acted quickly in anything that we could control, but absolutely. There was just a lot more fear in the house for sure because it just -- you know, we didn't -- these videos were getting more and more views.

It kind of took us out of this community that had been part of this tragedy and kind of put us more in a spotlight in everything that was going on. That was really scary. So, yeah, and just, you know, that time of year the focus is always the holidays and travel and family, and it was definitely, like, a big -- like, we were all disengaged from that a lot.

Q. Did you observe anything unusual about your wife's behavior during that time?

A. Yeah. I mean, she wasn't sleeping much at all at that point, starting that evening. When everybody left our home,

be in recess for the jury.

(The jury exited the courtroom at 1:42 p.m.)

THE COURT: Thank you, Mr. Carlsen. You may step down.

Please be seated. All right. I have an issue that I want to take up with counsel and Ms. Guillard for which I'd like to close the courtroom. So, Mr. Court Security Officer, if you would escort members of the gallery outside the courtroom.

We received -- Mr. Gordon did -- right before Mr. Carlsen came on the stand a note from a juror that was privately passed to Mr. Gordon.

I'm mindful of the First Amendment right of public access to civil proceedings in closing the courtroom right now, and I cite to *Richmond Newspapers v. Virginia* and *Press-Enterprise Company v. Superior Court*. I find because this issue involves juror anonymity and perhaps juror safety that there's a compelling interest to close the courtroom. I'm going to narrowly tailor this courtroom closure to that interest. It's going to be a short duration while I provide the note to the parties and then discuss how we address it, and I don't find that there's any alternatives to closing the courtroom other than that.

Mr. Gordon, if you'll pass the note -- we made photocopies of it -- to both parties.

Who is that? The courtroom is closed. Can you lock the courtroom door?

COURT SECURITY OFFICER: Yes, sir.

THE COURT: Thank you.

I'm going to read the note into the record. Again, the note was provided by Juror Number -- that's a 5, Mr. Gordon?

MR. GORDON: I'm not sure, Your Honor.

THE COURT: It appears to be -- Juror Number 5 is the juror in the suit sitting in the front row, and he provided it to Mr. Gordon in the hallway prior to Mr. Carlsen's testimony about 1:05, 1:10 p.m.

The note states, "I would respectfully request that the Court instruct the defendant to refrain from similar disparagement toward the jury, slash, jurors. There is a growing fear in my mind that a large verdict in favor of -- and it's plaintiff symbol -- may result in retaliation."

Ms. Olson, I'll hear first from you on how you suggest I should address this. And if you want to take some time -- I know this is --

MS. OLSON: I've been doing this for a long time, Your Honor, and this is quite a new issue.

THE COURT: Yes. And I've had notes and certainly surprises come up in trial before, but it is definitely an issue that we have to address. I can give you my preliminary

thoughts about on how I digested this and think we should address it.

I want to make sure, even though he said there's a fear in his mind, that this has not been discussed with the other jurors and so -- because the evidence is still going in and I admonished all the jurors not to discuss this case, including with each other, prior to deliberations.

So I intended to bring in Juror Number 5 and ask him the following questions: First, have you abided by my instruction not to discuss the case before deliberations with your fellow jurors? Two, does this note express only your personal view? Three, did you share the view expressed in your note with your fellow jurors? And four, have you already made up your mind about the result of this case, or are you willing to consider evidence not yet introduced?

And so, you know, I think this is the best way to address it, but I'm certainly open to other suggestions.

MS. OLSON: Your Honor, I think that is -- those are all appropriate questions, and I would not recommend anything else at this point depending on his answers. There obviously may be more to do.

MS. GUILLARD: I would like to know what similar disparagement was, what he meant by my behavior. It says, "Defendant to refrain from similar disparagement."

And I also have concerns that this is the same juror

that worked for the firm that works closely with Stoel Rives and that he's now causing problems, and he has also decided a large verdict in favor of the plaintiff without me even being able to testify on my behalf. And I think that's an issue for due process.

THE COURT: And those are certainly fair concerns, Ms. Guillard.

MS. GUILLARD: Also, I haven't done anything to anyone.

THE COURT: I think -- without interpreting his intent, I think the disparagement he's referring to is what you essentially said on the TikTok videos. So he's fearful, it seems, that if a -- this is my interpretation -- fearful that if the jury was to award a large verdict in favor of Ms. Scofield, that the jurors would then be the subject of similar TikTok videos by you.

MS. GUILLARD: Well, that's irrational thoughts.

THE COURT: And I understand that, and that's again just my opinion on this.

Ms. Olson, what is your opinion, beyond asking the four questions that I proposed?

MS. OLSON: Well, Your Honor, depending on the answer, obviously, he could be -- I didn't know if we were dismissing two as alternates or eight are deliberating, quite frankly. But that -- there may be -- there may be a basis to

just -- at the end the Court could say, you know, "You are an alternate. I'm sorry. You're being excused."

I would also just for the record make clear that Ms. Guillard had the opportunity to use a peremptory strike against Juror Number 5. She had peremptory strikes, and she elected not to do that.

THE COURT: And the record is clear on that.

I would also like -- if the court security officers could help me with that. I would like to cover the windows there when we break for a moment, because I want to preserve this juror's anonymity, and I don't want --

COURT SECURITY OFFICER: May I approach to grab --

THE COURT: You may, Patrick.

I want to preserve as much anonymity when we ask these questions.

And, Ms. Guillard, after we ask him the questions, you can make any motion you wish as it relates to him, and I'll consider that motion. All right?

MS. GUILLARD: Yes, sir.

THE COURT: Okay. Mr. Gordon, if you'll bring that juror back into the courtroom.

Another issue, Ms. Olson, Ms. Guillard, is how to do this in a way that doesn't raise the other alarm bells of the other jurors as to why one of those fellow jurors are being brought back into the courtroom, but I don't know any way

around that.

MS. OLSON: Your Honor, certainly this could take a little bit of time, but you could say this is an opportunity for everyone to go outside and stretch their legs and then sort of get -- or let [redacted] -- Juror Number 5 know that there is an issue that -- or a question someone has or something like that. He will probably expect it, I think.

THE COURT: Yeah, I'm sure he does. I just don't know --

MS. OLSON: I mean, the Court could say there's a phone call, tell the other jurors there's an outside matter that Juror Number 5 needs to address.

THE COURT: Ms. Guillard, I'll ask you as well if you have any thoughts on that. I could have Mr. Gordon just go in and say, Mr. Juror Number 5, there is a telephone call that -- or there's a matter, you know, outside of the court that you need to address," or something.

MS. GUILLARD: Sounds good.

THE COURT: All right. Just say, "A matter unrelated to the court, to what's going on with the court, for you to address." I don't want to lie, but I don't want the other jurors to be alarmed.

MR. GORDON: Can I just say, "The jury administrator received a message that requires your attention"?

THE COURT: That's fine.

(Juror Number 5 entered the courtroom.)

THE COURT: Please be seated. You're Juror Number 5; is that correct?

JUROR NUMBER 5: Yes, Your Honor.

THE COURT: You're not in trouble. We're just here to address the note that you gave to Mr. Gordon. And I've given it to the parties. They're aware of it and what you said. I just want to ask you a few questions about that.

The first question is that I admonished you at the beginning of the case do not discuss the case with anyone, including your fellow jurors. Have you abided by that admonishment?

JUROR NUMBER 5: Yes, Your Honor.

THE COURT: All right. And this note mentions that you have a -- "There is a growing fear in my mind." Did this note express only your personal view?

JUROR NUMBER 5: It did, Your Honor.

THE COURT: And did you share that view expressed in your note with any of your fellow jurors?

JUROR NUMBER 5: No, Your Honor.

THE COURT: And then lastly, have you already made up your mind about the result of this case, or are you willing to consider evidence not yet introduced?

JUROR NUMBER 5: First part of the question, no, Your Honor, I have not made up my mind. And, yes, I am willing to

be a fair and impartial judge of -- trier of the remaining facts in the case.

THE COURT: All right. Ms. Olson, do you have anything else that you think you'd like me to ask Juror Number 5?

MS. OLSON: No, Your Honor.

THE COURT: Ms. Guillard?

MS. GUILLARD: I would like to know what specific fears he have that I would do.

JUROR NUMBER 5: Your Honor, to that question, I don't have specific fears, but the accumulation of evidence has created a particular fear that any one of us may also be subject to the same conduct.

THE COURT: What do you mean by "the same conduct"?

JUROR NUMBER 5: Being targeted by social media, and not necessarily by the defendant but by anybody, due to our engagement in the case.

THE COURT: All right. And you're aware that your identity is anonymous to everyone outside the people in the courtroom now?

JUROR NUMBER 5: Yes, Your Honor.

THE COURT: Okay. All right. Do you think that your fear of potential retaliation by anyone is going to distract you from your fair and impartial consideration of the evidence in this case?

JUROR NUMBER 5: No, Your Honor, and it hasn't until this point. I've been very attentive the entire time.

THE COURT: You say "until this point." Have you been attentive since providing the note?

JUROR NUMBER 5: Very much so, yes, Your Honor.

THE COURT: All right. Okay. Anything else, Ms. Olson?

MS. OLSON: No, Your Honor.

THE COURT: Anything else, Ms. Guillard?

MS. GUILLARD: He made a statement that he projects a large verdict in favor of the plaintiff. Why is he already thinking about large verdicts in favor of the plaintiff despite not hearing all of the evidence in the case?

THE COURT: He -- Mr. Juror Number 5, if you want to respond to whether or not you've already made up your mind or whether you are willing to consider the evidence not yet introduced despite the fact that you have a fear that a large verdict in favor of plaintiff may result in retaliation.

JUROR NUMBER 5: Yes, Your Honor. I have no prediction one way or the other whether there will be a large jury verdict, strictly limiting to what I said in my note.

THE COURT: All right. Anything else, Ms. Guillard?

MS. GUILLARD: No, sir.

THE COURT: All right. Thank you, Juror Number 5. You may be excused. Mr. Gordon will bring you back to the

jury room.

(Juror Number 5 exited the courtroom.)

THE COURT: All right. Does either party have any motions?

MS. OLSON: Professor Scofield does not, Your Honor.

MS. GUILLARD: I do motion to remove him as a juror, and the reason is because he already had -- it was already a concern of him having a bias because he worked with a firm that also works with Professor Scofield's attorneys' firm, Stoel Rives. He came up to the bench and he stated that he could be an unbiased juror. I believed him.

But then now today he's presenting a note first that presents me in a light that isn't true and accurate to me and also presenting a note that shows bias, that he's already thinking about a large verdict in favor of the plaintiff. So with those two things together, I think it's best to remove him as a juror completely.

THE COURT: Ms. Olson, do you have a response to that?

MS. OLSON: Your Honor, I understand Ms. Guillard's concerns, but what we have on the record is a juror who indicates he's been very diligent, and he answered the Court's questions to indicate that he could be fair and impartial. It will be the Court's decision, but that's our position.

THE COURT: All right. Thank you, Ms. Olson.

I will take a brief recess and go discuss the matter with Mr. Gordon and make a decision on Ms. Guillard's motion.

The Court will be in brief recess.

(At 2:01 p.m., a recess was taken until 2:16 p.m.)

THE COURT: Please be seated.

Ms. Olson.

MS. OLSON: During, Your Honor, the break and having a chance to talk about it in more detail with our client, we do not oppose Ms. Guillard's motion to excuse Juror Number 5.

THE COURT: All right. That's what we'll do, then. I will grant Ms. Guillard's motion to excuse Juror Number 5. My thought is to bring him back into the courtroom. Again, Mr. Gordon's telling him that there's an issue with the jury administrator at this time. This time it's accurate. She's out there waiting to escort him after the jury comes back in back into the jury room to get his stuff so we don't have to do it in their full view.

I'll bring him back into the courtroom, let him know that Ms. Guillard made a motion to excuse him, and that in the interests of the -- both the fairness of the proceedings and the perception of the fairness of the proceedings, that I think I'm going to grant that motion and excuse him and thank him.

I'm going to ask him to refrain from discussing the case with anyone unless and until we get a verdict in the

case. I don't know how much power I have to do that once he's been excused as a juror, but I'm going to tell him that just to make sure that we don't have other issues and he doesn't contact any of the other jurors that he might have made friends with or anything along those lines.

Does anyone have a problem with that?

MS. OLSON: No, Your Honor.

MS. GUILLARD: No, sir.

THE COURT: All right. Mr. Gordon.

MS. GUILLARD: Is today a 3:00 day?

THE COURT: Yes. I don't want to -- jurors may have made plans already, pick up kids and things of that nature. So we'll -- when we're done with this, we will have the next plaintiff's witness, and then I imagine that'll take us to the end of the court day and that we'll start with your case in chief tomorrow.

MS. GUILLARD: Yes, sir.

(Juror Number 5 entered the courtroom.)

THE COURT: Please be seated.

All right. Juror Number 5, I wanted to thank you again for how upright and truthful you were in giving me your thoughts at this stage. I 100 percent believe in your answers to me in the questions that I asked of you, but one of the parties made a motion to excuse you as a juror that I'm going to grant, not because I believe you would do anything unfair

in the case but primarily because of the perception of unfairness that there might be if someone were to be looking at this case and scrutinizing it later as to whether or not someone had made up their mind prior to all of the evidence coming in. Again, there's nothing ever wrong with telling the truth, especially in this context, and I appreciate your thoughts.

So I'm going to excuse you with the thanks of the Court and appreciate your service in the case. I'll ask that you not discuss the case unless and until there is a verdict in the case and that you refrain from contacting any of your fellow jurors until after the case is over. Can you abide by that?

JUROR NUMBER 5: Yes, Your Honor.

THE COURT: And again, I apologize because I don't normally like meeting truthfulness with some repercussion like this, but I've got a bigger issue to concern myself with, and that is the perception of unfairness that could be had at this stage. And so I'm going to grant that motion and excuse you again with the thanks of the Court.

Ms. Richter, our jury administrator, will be out in the hallway to sit with you in an office here as the other jurors come back into the courtroom. Then you can go back into the jury room and collect your belongings, and she'll escort you in a way that I don't want you to be out in the

public on this floor, that you can just take an elevator from one floor down and then be on your way.

Again, I don't do this because you need to be embarrassed in any way by anything. Never be embarrassed about telling the truth. I just don't want any personal repercussion to you by way of there's maybe people in the gallery that might see you or recognize you as you leave.

All right. Again, my sincere thanks both for telling me what you did and also for your service over the past few days. Thank you, Juror Number 5.

(Juror Number 5 exited the courtroom.)

THE COURT: Please be seated.

I intend to tell the other jurors that Juror Number 5 when we pulled him back into the courtroom has been excused for a personal matter with the thanks of the Court for his service and that the other jurors should not speculate or discuss what that reason might be, just chalk it up to a personal matter that involved him. And we will go forward now with seven jurors in the case.

Anything else you'd like me to say, Ms. Olson?

MS. OLSON: No, not with respect to the jurors as they come back in, Your Honor.

THE COURT: Anything else that you wish me to say? Ms. Olson, anything else? You said "not with respect to the jurors."

MS. OLSON: We do have the stipulation. I imagine you want us to do that when the public -- when the court is unsealed, but I also want to make the Court aware that we've got that now.

THE COURT: I'll review it if you want to give it to Mr. Gordon. And then what I'll do is -- please remind me if I forget, but at the end of your last witness, prior to resting your case, if you'll say, "Your Honor, we have a stipulation of fact that we wish to read to the jury," and I'll just ask you to read it to the jury from the podium.

MS. OLSON: Okay.

THE COURT: Unless you think that I should read it.

MS. OLSON: No, Your Honor, I'm ready to read it. We have one copy because we have no printer here or anything and we had to handwrite it, but I'm sure that someone with good handwriting -- not me -- wrote it.

THE COURT: Ms. Fifer, can you grab that from Ms. Olson, and I'll just read it. It's a stipulation from the parties --

MS. OLSON: And I've shown it to Ms. Guillard.

THE COURT: Ms. Guillard, what I intend to say to the jurors, any problem with that?

MS. GUILLARD: No, sir.

THE COURT: Okay. All right. Randy, Chad, as soon as -- why don't we take those off, and we can let the gallery

back in before the jurors come back in. I don't want the jurors to see that --

MR. GORDON: Judge, do you want them in their original seats, like the seats that they were in -- there's an empty chair -- or to move up?

THE COURT: They can do what they wish. They can move up so it doesn't look like somebody died.

(The jury entered the courtroom at 2:27 p.m.)

THE COURT: All right. Please be seated.

Members of the jury, thank you very much for your patience. As you'll notice, one of your fellow jurors is not in the courtroom now. He had a personal matter for which he is being excused from the jury. I excused him with the sincere thanks of the Court.

Now we'll just have seven jurors in the case, and the seven of you will decide it. I ask that you not speculate as to the reasons for his being excused. It was simply a personal matter and nothing anyone did wrong.

All right. Ms. Olson, will you call your next witness.

MS. OLSON: Yes. Professor Scofield calls Margie Scofield.

(The witness was sworn.)

THE COURTROOM DEPUTY: Please state your full name and spell your last for the record.

C E R T I F I C A T E

I, ANNE BOWLINE, a Registered Merit Reporter and Certified Realtime Reporter, do hereby certify that I reported by machine shorthand the proceedings contained herein on the aforementioned subject on the date herein set forth, and that the foregoing 230 pages constitute a full, true, and correct transcript.

Dated this 20th day of May, 2026.

/s/ Anne Bowline

ANNE BOWLINE
Registered Merit Reporter
Certified Realtime Reporter

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

REBECCA SCOFIELD,

Plaintiff,

vs.

ASHLEY GUILLARD,

Defendant.

Case No. 3:22-CV-00521-REP

Volume IV of IV

Boise, Idaho

February 27, 2026
8:28 a.m.

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

BEFORE THE HONORABLE RAYMOND E. PATRICCO
CHIEF UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff: MS. WENDY OLSON
MR. CORY MICHAEL CARONE
Stoel Rives, LLP
101 S. Capitol Boulevard, Suite 1900
Boise, Idaho 83702

For the Defendant: MS. ASHLEY GUILLARD
3262 Westheimer Rd, 942
Houston, Texas 77098

Court Reporter: MS. ANNE BOWLINE, RMR, CRR
Anne_Bowline@id.uscourts.gov

*Proceedings recorded by stenography; transcript produced by computer-aided transcription.*

# I N D E X


| DEFENDANT'S WITNESS | PAGE |
|---|---|
| ASHLEY GUILLARD | |
| Direct Examination by Ms. Guillard | 611 |
| Cross-Examination by Ms. Olson | 642 |
| Redirect Examination by Ms. Guillard | 674 |

| PLAINTIFF'S EXHIBITS | RECEIVED |
|---|---|
| 29 | 648 |
| 30 | 649 |
| 44 | 650 |
| 45 | 651 |

| DEFENDANT'S EXHIBITS | RECEIVED |
|---|---|
| 503 | 630 |
| 505 | 623 |
| 506 | 632 |
| 507 | 620 |
| 510 | 633 |
| 513 | 633 |
| 514 | 636 |
| 515 | 631 |
| 517 | 635 |
| 520 | 618 |

Case: 26-2190, 09/28/2026, DktEntry: 12.6, (114 of 204)




| MOTIONS | PAGE |
| --- | --- |
| motion to strike Juror Number 13 | |
| Mr. Carone | 598 |
| the Court | 599 |
| Ms. Guillard | 600 |
| the Court | 601 |

| JURY INSTRUCTIONS | PAGE |
| --- | --- |
| jury instructions read by the Court | 677 |
| final jury instructions read by the Court | 717 |

| CLOSING ARGUMENTS | PAGE |
| --- | --- |
| Ms. Olson | 685 |
| Ms. Guillard | 709 |
| rebuttal by Ms. Olson | 715 |

| THE VERDICT | PAGE |
| --- | --- |
| verdict read by the courtroom deputy | 723 |

(Proceedings commenced at 8:28 a.m., February 27, 2026.)

(The following took place outside the presence of the jury.)

THE COURT: Please be seated.

THE COURTROOM DEPUTY: The Court will now take up day four of the jury trial for Scofield versus Guillard, Case Number 3:22-CV-521-REP.

THE COURT: All right. Good morning, Counsel, Ms. Scofield, and Ms. Guillard. The first thing I want to take up before we get to plaintiff resting or if she has any other exhibits is Ms. Guillard's motion from last night to excuse Juror Number 13 for cause. I read the motion and reviewed a bit of the transcript.

Ms. Guillard, do you want to say anything more about that?

MS. GUILLARD: No, I don't have anything else other than what's already stated.

THE COURT: Ms. Olson, I know you haven't had a chance to respond in writing, but I'll hear any argument -- or Mr. Carone, any argument that you have.

MR. CARONE: Yes, Your Honor. We oppose the motion. During voir dire Juror Number 13 said that she would be fair and impartial, that she would listen to all of the evidence. Ms. Guillard, I believe, raised a motion for cause, which Your Honor denied. Your Honor also advised Ms. Guillard at that

time that she could use a peremptory strike on Juror Number 13 if she wanted to. She chose not to.

I think most of what's in Ms. Guillard's declaration are all things that came in at that time that she had full knowledge of when she chose not to use that peremptory strike. The only difference, I think, is paragraph number 5 and paragraph number 6 of Ms. Guillard's declaration. I personally have not observed that. I don't know if the Court has observed anything that's in this declaration, but there's certainly no record other than Ms. Guillard's declaration of any of those things happening.

Your Honor has also asked the jurors each morning at the beginning of trial if they've had any contact with anybody about this case, things of that nature, and they've all, including Juror Number 13, responded in the negative.

So our position is that there's no basis for this motion, and we ask that you deny it.

THE COURT: All right. Thank you, Mr. Carone.

Ms. Guillard, as it relates to your observation of a head nod that Juror Number 13 may have made towards Ms. Scofield, I'll note that you did not raise that at the time that it happened, and I did not notice it, and I've been paying very close attention to the jury as the testimony's come in. I'm not saying that you didn't perceive it happening, but it's hard for me to rule on that not having had

it raised at the time it happened.

So at least as it goes forward in this case, you'd have to bring that to my attention when it happens so that there's something I can do to ameliorate or address the problem in real time. Otherwise, I can't go back and say, "Two days ago, Juror Number 13, you nodded towards Ms. Scofield." She may not remember it or it -- you know, it may not have happened the way you perceived it according to her. So that's what I would advise you going forward.

Anything more you want to say about the motion?

MS. GUILLARD: Well, two days ago she was Juror Number -- she was, like, in the seventh position in my -- from my understanding, it's going to be six jurors who are voting --

THE COURT: She was -- she was there in the eighth position or --

MS. GUILLARD: She was the seventh position, so from my understanding, she wasn't going to be, like, a voting member.

THE COURT: No. All the jurors that are on the -- there are no alternates in this case. All the jurors vote.

MS. GUILLARD: So when I didn't raise it, that was my impression, that she wasn't going to be a voting member and once Juror Number 5 was excused yesterday, she then became a voting member. So what I observed her doing then became a

concern for me.

THE COURT: I understand, then, why you waited to raise it, so that makes sense. But as I mentioned at the beginning of the case -- and it may not have resonated with you -- that there are no alternates in this case. All of the jurors are voting members. But I certainly understand why it is you waited to raise this, because you believed that she was going to be an alternate; is that correct?

MS. GUILLARD: Yes.

THE COURT: All right. I understand what you're saying, Ms. Guillard.

All right. Well, I've reviewed the motion, the memorandum in support, Ms. Guillard's declaration, heard arguments of counsel, and also went back and reviewed the transcript of both what Juror Number 13 said during voir dire and then our -- Ms. Guillard's motion for cause up at the bench, and my ruling at the bench.

Based on all of those facts, I'm going to deny the motion to excuse Juror Number 13 for cause. I'll note that, you know, Juror Number 13 first raised this issue in the context of a question that I asked if any of the jurors had any religious or philosophical reasons why they could not sit in judgment.

Juror Number 13 effectively said that she is Catholic and she has a hard time believing in psychic medium stuff and

C E R T I F I C A T E

I, ANNE BOWLINE, a Registered Merit Reporter and Certified Realtime Reporter, do hereby certify that I reported by machine shorthand the proceedings contained herein on the aforementioned subject on the date herein set forth, and that the foregoing 134 pages constitute a full, true, and correct transcript.

Dated this 20th day of May, 2026.

/s/ Anne Bowline

ANNE BOWLINE
Registered Merit Reporter
Certified Realtime Reporter

| File Name | Date Posted | Screenshot of TikTok or YouTube |
|---|---|---|
| F1026638-solvingmysteriousdeaths-idahocollegestudents.mp4 | 11/23/2022 |  |
| F1026698-solvingmysteriousdeaths-universityofidaho-universityofidahomurder-rebeccascofield-kayleegoncalves-xanakernodle-ethanchapin-madisonmogen-domesticviolence.mp4 | 11/24/2022 |  |

Plaintiff's Ex. 13
3:22-cv-00521-REP
exhibitsticker.com

| | | |
|---|---|---|
| F1026703-Replying-to-lexie.brenneis-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-rebeccascofield-kayleegoncalves-xanakernodle-ethanchapin-madisonmogen-domesticviolence.mp4 | 11/24/2022 |  |
| F1026707-greenscreen-solvingmysteriousdeaths-universityofidaho-universityofidahomurder-rebeccascofield-kayleegoncalves-xanakernodle-ethanchapin-madisonmogen.mp4 | 11/24/2022 |  |

| | | | |
|---|---|---|---|
| F1026712-greenscreen-solvingmysteriousdeaths-universityofidaho-universityofidahomurder-xanakernodle-ethanchapin-madisonmogen-kayleegoncalves-rebeccascofield.mp4 | 11/24/2022 | |   |
| F1026596-solvingmysteriousdeaths-universityofidahomurder-xanakernodle-ethanchapin-kayleegoncalves-madisonmogen.mp4 | 11/24/2022 | |   |

| | | | |
|---|---|---|---|
| F1026603-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-xanakernodle-ethanchapin.mp4 | 11/24/2022 | |  |
| F1026608-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-kayleegoncalves.mp4 | 11/24/2022 | |  |

| | | |
|---|---|---|
| F1026614-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-madisonmogen.mp4 | 11/24/2022 |   |
| F1026620-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-domesticviolence.mp4 | 11/24/2022 |   |

| | | |
|---|---|---|
| F1026626-solvingmysteriousdeaths-universityofidahomurder-universityofidaho.mp4 | 11/24/2022 |  |
| F1026632-solvingmysteriousdeaths-universityofidahomurder-universityofidaho.mp4 | 11/24/2022 |  |

| | | |
|---|---|---|
| F1026661-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-kayleegoncalves.mp4 | 11/24/2022 |  |
| F1026667-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-xanakernodle-ethanchapin.mp4 | 11/24/2022 |  |

| | | |
|---|---|---|
| F1026673-solvingmysteriousdeaths-universityofidahomurder-xanakernodle-ethanchapin-kayleegoncalves-madisonmogen.mp4 | 11/24/2022 |   |
| F1026679-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-xanakernodle-ethanchapin-madisonmogen-kayleegoncalves.mp4 | 11/24/2022 |   |

| | | | |
|---|---|---|---|
| F1026685-solvingmysteriousdeaths-universityofidaho-kayleegoncalves-universityofidahomurder.mp4 | 11/24/2022 | |  |
| F1026646-greenscreen-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-jackdecoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-rebeccascofield.mp4 | 11/25/2022 | |  |

| | | |
|---|---|---|
| F1026652-greenscreen-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-jackdecoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle.mp4 | 11/25/2022 |   |
| F1026658-TikTok-video-7170100018202807594.mp4 | 11/25/2022 |   |

<table>
<tr>
<td>F1026664-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-rebeccascofield-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle.mp4</td>
<td>11/25/2022</td>
<td>
</td>
</tr>
<tr>
<td>F1026682-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-rebeccascofield-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle.mp4</td>
<td>11/25/2022</td>
<td>
</td>
</tr>
</table>

| | | |
|---|---|---|
| F1026688-greenscreen-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-rebeccascofield-kayleegoncalves-xanakernodle-madisonmogen-ethanchapin.mp4 | 11/25/2022 |  |
| F1026693-solvingmysteriousdeaths-universityofidaho-universityofidahomurder-rebeccascofield-kayleegoncalves.mp4 | 11/25/2022 | **B. Policy.** In order to foster healthy professional relationships at all levels of the institution, it is the policy of the University of Idaho that no employee shall enter into or continue a romantic or sexual relationship with a student or employee over whom she or he exercises academic, administrative, supervisory, evaluative, counseling or other authority.<br><br>This policy recognizes that circumstances may develop that place one party to an existing romantic or sexual relationship in a position of authority over the other. It further recognizes that, despite this policy, consensual romantic or sexual relationships may develop in existing relationships of authority. Therefore, if a prohibited consensual relationship exists or arises, either the consensual relationship must end or the relationship of authority must be eliminated. The employee in the position of authority must disclose the romantic or sexual relationship to his or her immediate supervisor or to the next level supervisor. If the parties are unable, or do not agree, to immediately end the romantic or sexual relationship, the supervisor must take prompt and appropriate action to end the relationship of authority. |

| | | |
|---|---|---|
| F1026604-universityofidahomurder-solvingmysteriousdeaths-universityofidaho-madisonmogen-jake.mp4 | 11/26/2022 |  |
| F1026610-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-jackdecoeur-rebeccascofield.mp4 | 11/26/2022 |  |

| | | | |
|---|---|---|---|
| F1026616-greenscreen-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-jackdecoeur-rebeccascofield-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle.mp4 | 11/26/2022 | |  |
| F1026622-greenscreen-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-jackdecoeur-rebeccascofield.mp4 | 11/26/2022 | |  |

| | | | |
|---|---|---|---|
| F1026640-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-jackdecoeur-rebeccascofield.mp4 | 11/26/2022 | |   |
| F1026686-greenscreen-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur.mp4 | 11/28/2022 | |   |

| | | |
|---|---|---|
| F1026691-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-rebeccascofield-kayleegoncalves-madisonmogen-xanakernodle-ethanchapin.mp4 | 11/28/2022 |  |
| F1026696-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-madisonmogen-kayleegoncalves-xanakernodle-ethanchapin.mp4 | 11/28/2022 |  |

| | | |
|---|---|---|
| F1026701-Replying-to-sarah_sharpe14-greenscreen-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-madisonmogen-kayleegoncalves-ethanchapin-xanakernodle.mp4 | 11/28/2022 |  |
| F1026706-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-madisonmogen-kayleegoncalves-ethanchapin-xanakernodle.mp4 | 11/28/2022 |  |

| | | |
|---|---|---|
| F1026710-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur.mp4 | 11/28/2022 |   |
| F1026580-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur.mp4 | 11/28/2022 |   |

| | | |
|---|---|---|
| F1026586-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur.mp4 | 11/28/2022 |  |
| F1026592-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-rebeccascofield-jackdecoeur.mp4 | 11/28/2022 |  |

| | | | |
|---|---|---|---|
| F1026598-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-rebeccascofield.mp4 | 11/28/2022 | |  |
| F1026680-greenscreen-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-jackducoeur-rebeccascofield.mp4 | 11/29/2022 | |  |

| | | |
|---|---|---|
| F1026657-Replying-to-martamedina231-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-jackducoeur-rebeccascofield.mp4 | 11/30/2022 |  |
| F1026663-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-jackducoeur-rebeccascofield-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle.mp4 | 11/30/2022 |  |

| | | |
|---|---|---|
| F1026669-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-jackducoeur-rebeccascofield-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle.mp4 | 11/30/2022 |  |
| F1026675-Replying-to-wildthor144-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-jackducoeur-rebeccascofield-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle.mp4 | 11/30/2022 |  |

| | | |
|---|---|---|
| F1026639-Replying-to-ashleytaylorlies-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle.mp4 | 12/1/2022 |   |
| F1026645-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur.mp4 | 12/1/2022 |   |

| | | |
|---|---|---|
| F1026651-Replying-to-habsolutely-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-jackducoeur-rebeccascofield-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle.mp4 | 12/1/2022 |  |
| F1026621-Replying-to-jordancheyenneofficial-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd-moscowidaho.mp4 | 12/2/2022 |  |

| | | |
|---|---|---|
| F1026627-Replying-to-fithippie-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle.mp4 | 12/2/2022 |   |
| F1026633-solvingmysteriousdeaths-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle.mp4 | 12/2/2022 |   |

| | | |
|---|---|---|
| F1026630-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd.mp4 | 12/4/2022 |   |
| F1026636-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd.mp4 | 12/4/2022 |   |

<table>
<tr><td>F1026582-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-jackducoeur-rebeccascofield.mp4</td><td>12/5/2022</td><td>
</td></tr>
<tr><td>F1026588-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur.mp4</td><td>12/5/2022</td><td>
</td></tr>
</table>

| | | | |
|---|---|---|---|
| F1026594-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd.mp4 | 12/5/2022 | |  |
| F1026600-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd.mp4 | 12/5/2022 | |  |

| | | |
|---|---|---|
| F1026606-greenscreen-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd.mp4 | 12/5/2022 |  |
| F1026612-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd.mp4 | 12/5/2022 |  |

| | | | |
|---|---|---|---|
| F1026618-greenscreen-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd.mp4 | 12/5/2022 | |  |
| F1026624-greenscreen-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd.mp4 | 12/5/2022 | |  |

| | | | |
|---|---|---|---|
| F1026577-solvingmysteriousdeaths-unsolvedmysteries-universityofidaho-universityofidahomurder-beccatoldmeto-rebeccascofield-jackducoeur.mp4 | 12/6/2022 | |   |
| F1026574-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidahomurder-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd-beccatoldmeto.mp4 | 12/8/2022 | |   |

| | | | |
|---|---|---|---|
| F1026705-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-xanakernodle-ethanchapin-madisonmogen-kayleegoncalves-moscowpd.mp4 | 12/9/2022 | |  |
| F1026579-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-xanakernodle-ethanchapin-madisonmogen-kayleegoncalves-moscowpd.mp4 | 12/9/2022 | |  |

| | | |
|---|---|---|
| F1026585-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-xanakernodle-ethanchapin-madisonmogen-kayleegoncalves-moscowpd.mp4 | 12/9/2022 |  |
| F1026591-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-xanakernodle-ethanchapin-madisonmogen-kayleegoncalves-moscowpd.mp4 | 12/9/2022 |  |

| | | |
|---|---|---|
| F1026597-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur.mp4 | 12/9/2022 |  |
| F1026602-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd.mp4 | 12/9/2022 |  |

| | | |
|---|---|---|
| F1026609-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd-universityofidaho.mp4 | 12/9/2022 |  |
| F1026615-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd-universityofidaho.mp4 | 12/9/2022 |  |

| | | |
|---|---|---|
| F1026642-greenscreen-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-xanakernodle-ethanchapin-madisonmogen-kayleegoncalves-moscowpd.mp4 | 12/10/2022 |  |
| F1026648-greenscreen-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-xanakernodle-ethanchapin-madisonmogen-kayleegoncalves-moscowpd.mp4 | 12/10/2022 |  |

| | | | |
|---|---|---|---|
| F1026654-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-xanakernodle-ethanchapin-madisonmogen-kayleegoncalves-moscowpd.mp4 | 12/10/2022 | |   |
| F1026660-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-xanakernodle-ethanchapin-madisonmogen-kayleegoncalves-moscowpd.mp4 | 12/10/2022 | |   |

| | | |
|---|---|---|
| F1026666-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-xanakernodle-ethanchapin-madisonmogen-kayleegoncalves-moscowpd.mp4 | 12/10/2022 |  |
| F1026672-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-xanakernodle-ethanchapin-madisonmogen-kayleegoncalves-moscowpd.mp4 | 12/10/2022 |  |

| | | |
|---|---|---|
| F1026678-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-xanakernodle-ethanchapin-madisonmogen-kayleegoncalves-moscowpd.mp4 | 12/10/2022 |  |
| F1026683-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-xanakernodle-ethanchapin-madisonmogen-kayleegoncalves-moscowpd.mp4 | 12/10/2022 |  |

| | | |
|---|---|---|
| F1026690-TikTok-video-7175321154830404910.mp4 | 12/10/2022 |  |
| F1026695-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-xanakernodle-ethanchapin-madisonmogen-kayleegoncalves-moscowpd.mp4 | 12/10/2022 |  |

| | | |
|---|---|---|
| F1026699-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-xanakernodle-ethanchapin-madisonmogen-kayleegoncalves-moscowpd.mp4 | 12/10/2022 |  |
| F1026628-Replying-to-scentsational_izzy-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-xanakernodle-ethanchapin-madisonmogen-kayleegoncalves-moscowpd.mp4 | 12/12/2022 |  |

| | | |
|---|---|---|
| F1026634-Replying-to-krystaledwards11-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-xanakernodle-ethanchapin-madisonmogen-kayleegoncalves-moscowpd.mp4 | 12/12/2022 |  |
| F1026670-greenscreen-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-xanakernodle-ethanchapin-madisonmogen-kayleegoncalves-moscowpd.mp4 | 12/13/2022 |  |

| | | |
|---|---|---|
| F1026676-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-xanakernodle-ethanchapin-madisonmogen-kayleegoncalves-moscowpd.mp4 | 12/13/2022 | <br> |
| F1026584-greenscreen-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-xanakernodle-ethanchapin-madisonmogen-kayleegoncalves-moscowpd.mp4 | 12/13/2022 | <br> |

| | | |
|---|---|---|
| F1026590-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur.mp4 | 12/14/2022 |   |
| F1026644-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-ethanchapin-xanakernodle-moscowpd.mp4 | 12/14/2022 |   |

| | | | |
|---|---|---|---|
| F1026649-greenscreen-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-ethanchapin-xanakernodle-moscowpd.mp4 | 12/14/2022 | |  |
| F1026656-Replying-to-maganchilcote549-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-ethanchapin-xanakernodle-moscowpd-madisonmogen.mp4 | 12/14/2022 | |  |

| | | |
|---|---|---|
| F1028925-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd.mp4 | 12/16/2022 |  |
| F1028926-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd.mp4 | 12/18/2022 |  |

| | | | |
|---|---|---|---|
| F1028927-greenscreen-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd.mp4 | 12/18/2022 | |  |
| F1028928-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd.mp4 | 12/18/2022 | |  |

| | | |
|---|---|---|
| F1028929-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd.mp4 | 12/18/2022 |  |
| F1028930-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd.mp4 | 12/18/2022 |  |

| | | |
|---|---|---|
| F1028931-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd.mp4 | 12/18/2022 |   |
| F1028932-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd.mp4 | 12/18/2022 |   |

| | | |
|---|---|---|
| F1028933-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd.mp4 | 12/18/2022 |  |
| F1028934-solvingmysteriousdeaths-unsolvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd.mp4 | 12/18/2022 |  |

| | | |
|---|---|---|
| F1028935-solvingmysteriousdeaths-solvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd.mp4 | 12/18/2022 |   |
| F1028936-solvingmysteriousdeaths-solvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd.mp4 | 12/18/2022 |   |

| | | | |
|---|---|---|---|
| F1028937-solvingmysteriousdeaths-solvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd.mp4 | 12/18/2022 | |  |
| F1028938-solvingmysteriousdeaths-solvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd.mp4 | 12/18/2022 | |  |

| | | |
|---|---|---|
| F1028940-solvingmysteriousdeaths-solvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd.mp4 | 12/19/2022 |   |
| F1028941-solvingmysteriousdeaths-solvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd.mp4 | 12/19/2022 |   |

| | | |
|---|---|---|
| F1028942-solvingmysteriousdeaths-solvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd.mp4 | 12/19/2022 |   |
| F1028943-solvingmysteriousdeaths-solvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd.mp4 | 12/19/2022 |   |

| | | |
|---|---|---|
| F1028944-solvingmysteriousdeaths-solvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd.mp4 | 12/19/2022 |  |
| F1028945-solvingmysteriousdeaths-solvedmysteries-universityofidahomurder-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd.mp4 | 12/19/2022 |  |

| | | | |
|---|---|---|---|
| F1028946-solvingmysteriousdeaths-universityofidahomurder-solvedmysteries-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd.mp4 | 12/19/2022 | |   |
| F1028947-solvingmysteriousdeaths-universityofidahomurder-solvedmysteries-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd.mp4 | 12/19/2022 | |   |

| | | | |
|---|---|---|---|
| F1028948-solvingmysteriousdeaths-universityofidahomurder-solvedmysteries-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd-unsolvedmysteries.mp4 | 12/19/2022 | |  |
| F1028949-solvingmysteriousdeaths-universityofidahomurder-solvedmysteries-universityofidaho-rebeccascofield-jackducoeur-kayleegoncalves-madisonmogen-ethanchapin-xanakernodle-moscowpd-unsolvedmysteries.mp4 | 12/19/2022 | |  |

| | | |
|---|---|---|
| F1399312-Full-synopsis-of-the-plot-to-kill-the-4-university-of-Idaho-students-Ashley-Guillards-Testimony.mp4 | 2/9/2023 |  |

November 28, 2022

**VIA EMAIL ONLY**

Ashley Guillard
Ashleyisinthebookoflife
Ashlisgod.com
tarotbyashleyg@gmail.com

**Re: Cease and Desist – False and Defamatory Statements Regarding Professor Rebecca Scofield**

Dear Ms. Guillard:

I represent Rebecca Scofield, an associate professor at the University of Idaho. You have made false and defamatory statements regarding Professor Scofield on TikTok. If you do not immediately remove all such false and defamatory TikToks from that platform, of which there are at least 15, and immediately cease and desist from making or publishing any similar TikToks or false statements on any other public platform, Professor Scofield will initiate litigation against you and your entities in Idaho State and/or Federal Court.

As you know, your TikToks are false in at least two respects. First, they falsely state that Professor Scofield is responsible in whole or in part for the murder of four University of Idaho students, whose murders occurred on November, 13, 2022. Second, your TikToks falsely state that Professor Scofield had engaged in or attempted to engage in a romantic relationship with one of the murdered students while Professor Scofield was a professor and the student was a student at the University of Idaho. There is no factual basis for either of these false statements. Nor could you in good faith reasonably make such statements believing they were true. You have no personal knowledge regarding these tragic crimes nor do you have any personal knowledge regarding Professor Scofield's work at the University of Idaho. To be certain, Professor Scofield played no role in these horrific crimes, nor did she engage in or attempt to engage in a romantic relationship with any of the murdered students. Your false statements are per se defamatory under Idaho law. They place Professor Scofield and her family in danger. They also deflect attention from the facts of the murders, harm the victims and their families, and potentially divert resources necessary to solve these crimes.

In a defamation case in Idaho, a plaintiff must prove that a defendant: (1) communicated information concerning the plaintiff to others; (2) that the information was defamatory; and (3) that the plaintiff was damaged because of the communication. *Clark v. Spokesman-Rev.*, 144 Idaho 427, 430, 163 P.3d 216, 219 (2007). A defamatory statement is one that tends to harm a person's reputation, usually by subjecting a person to public contempt, disgrace, or ridicule, or by adversely affecting the person or the person's business. *Elliott v. Murdock*, 161 Idaho 281,

Plaintiff's Ex.
19
3:22-cv-00521-REP
exhibitsticker.com

287, 385 P.3d 459, 465 (2016). Defamatory statements may be defamatory per se, meaning they are actionable without proof of special damages when they impute conduct constituting a criminal offense of such kind as to involve infamous punishment (death or imprisonment) or moral turpitude conveying the idea of major social disgrace. *Irish v. Hall*, 163 Idaho 603, 607–08, 416 P.3d 975, 979–80 (2018) (citing *Barlow v. Int'l Harvester Co.*, 95 Idaho 881, 890, 522 P.2d 1102, 1111 (1974)); *Sadid v. Vailas*, 943 F. Supp. 2d 1125, 1134 (D. Idaho 2013) ("Idaho follows the common law rule allowing plaintiffs to receive an award of general damages without proof of special damages in defamation per se cases").

Your false statements regarding Professor Scofield constitute defamation per se. They are false, made with knowledge of falsity or with reckless disregard for truth or falsity, and they falsely allege that Professor Scofield engaged in criminal activity and engaged in activity involving moral turpitude that conveyed the idea of major social disgrace. Based on your defamatory statements to date, she could recover significant monetary damages from you. You must immediately take down your defamatory TikToks, and you must cease and desist from making additional TikToks – or making false statements of any kind -- defaming Professor Scofield. Professor Scofield also demands that you immediately publish a TikTok acknowledging your initial false statements and apologizing to Professor Scofield.

Please confirm that you will take these steps immediately and provide proof to me at the above address or email address that you have done so.

Sincerely,

Wendy J. Olson

Stoel Rives LLP

December 8, 2022

Wendy J. Olson
101 S Capitol Boulevard, Suite 1900
Boise, ID 83702
D. 208.387.4291
wendy.olson@stoel.com

Ashley Guillard
4100 Southwest Fwy, Apt 368,
Houston, TX 77027
tarotbyashleyg@gmail.com

**Re: Second Cease and Desist – False and Defamatory Statements Regarding Professor Rebecca Scofield**

Dear Ms. Guillard:

As you know, Stoel Rives, LLP represents Rebecca Scofield, an associate professor at the University of Idaho. You have made multiple false and defamatory statements regarding Professor Scofield on TikTok. On November 28, 2022, we sent you, by email, a cease-and-desist letter demanding that you immediately remove all such false and defamatory TikToks from that platform and immediately cease and desist from making or publishing any similar TikToks or false statements on any other public platform. You failed to do so. Instead, you knowingly published additional defamatory statements, repeating your previous false statements, and making additional false statements.

A copy of Professor Scofield's November 28, 2022, cease and desist letter is enclosed. Considering your failure to immediately remove previously published TikToks containing false and defamatory statements and considering your publication of additional such defamatory statements by TikTok, Professor Scofield intends to file a defamation lawsuit against you. If, following your receipt of this letter you do not immediately remove the defamatory TikToks and immediately cease and desist from making additional defamatory statements about Professor Scofield, the amount of damages Professor Scofield will seek to recover will increase substantially.

Professor Scofield has been patient and provided opportunities for you to cease making defamatory statements and to publicly correct your false statements. Your ongoing conduct is harmful to her, her professional reputation, and her family. We look forward to hearing that you have complied with Professor Scofield's demands.

Sincerely,

Wendy J. Olson

117585931.1 0099880-01458

Plaintiff's Ex.
20
3:22-cv-00521-REP
exhibitsticker.com

Filed: 07/02/2025 14:04:26
Fourth Judicial District, Ada County
**Trent Tripple, Clerk of the Court**
By: Deputy Clerk - Waters, Renee

LATAH COUNTY PROSECUTOR'S OFFICE
WILLIAM W. THOMPSON, JR., ISB No. 2613
PROSECUTING ATTORNEY
ASHLEY S. JENNINGS, ISB No. 8491
SENIOR DEPUTY PROSECUTING ATTORNEY
JOSHUA D. HURWIT, ISB. No. 9527
SPECIAL DEPUTY PROSECUTING ATTORNEY
Latah County Courthouse
522 S. Adams Street, Ste. 211
Moscow, ID 83843
Phone: (208) 883-2246
paservice@latahcountyid.gov

IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT OF THE

STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

| | |
|---|---|
| STATE OF IDAHO,<br>Plaintiff,<br><br>V.<br><br>BRYAN C. KOHBERGER,<br>Defendant. | Case No. CR01-24-31665<br><br>PLEA AGREEMENT |

THE STATE OF IDAHO, by and through the Latah County Prosecuting Attorney's Office, the Defendant Bryan C. Kohberger, and the Defendant's attorney, Anne Taylor, stipulate to the following Plea Agreement:



Plaintiff's Ex.
23
3:22-cv-00521-REP
exhibitsticker.com

1. The Defendant will enter guilty pleas to the following counts: Burglary, Idaho Code § 18-1401, 1403, a Felony in Count I; Murder in the First Degree, Idaho Code § 18-4001, 4002, 4003, 4004, a Felony in Count II; Murder in the First Degree, Idaho Code § 18-4001, 4002, 4003, 4004, a Felony in Count III; Murder in the First Degree, Idaho Code § 18-4001, 4002, 4003, 4004, a Felony in Count IV; and Murder in the First Degree, Idaho Code § 18-4001, 4002, 4003, 4004, a Felony in Count V; as stated in the Indictment.

2. The Defendant will be sentenced to ten (10) years fixed for Count I.

3. The Defendant will receive fixed consecutive life sentences for Counts II-V.

4. The State may seek restitution orders regarding funeral expenses and Crime Victims Compensation reimbursement in an amount to be determined.

5. Defendant understands (a) the nature of the charge to which the Defendant agrees to plead guilty and acknowledges that he is not being coerced into entering his plea of guilty; (b) the consequences of pleading guilty, including the maximum penalties that may be imposed and any mandatory minimum penalties; and that (c) by pleading guilty he waives his rights to a jury trial, to confront accusers, and to refrain from incriminating himself. Defendant further acknowledges that he is satisfied with his legal representation, has reviewed with his attorney all possible defenses, and by his plea of guilty voluntarily waives those defenses and all claims based upon his constitutional rights.

6. Defendant understands that, if were to proceed to trial, he would have a right to appeal, including but not limited to (a) any issues decided by the Court prior to the Defendant's guilty plea, including any rulings on the admissibility of evidence; (b) the judgment, including the finding of guilt and any issues regarding the guilty plea; and (c) the sentence. Further, the Defendant understands that, if were to proceed to trial, he would have the right to file a motion under Idaho Criminal Rule 35 seeking a reduction of the sentence. The Defendant hereby knowingly, voluntarily, and intelligently waives all rights to appeal any and all issues in this case and waives the right to file a motion pursuant to Idaho Criminal Rule 35.

7. This is the entire agreement and understanding between the parties.

IT IS SO STIPULATED this 30 day of June 2025.

7/2/25

William W. Thompson, Jr.
Latah County Prosecuting Attorney

Anne Taylor
Counsel for Defendant

7/2/25

Ashley S. Jennings
Senior Deputy Prosecuting Attorney

Bryan C. Kohberger
Defendant

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF** IDAHO

**Form 1. Notice of Appeal from a Judgment or Order of a United States District Court**

U.S. District Court case number: 3:22-cv-00521-REP

Notice is hereby given that the appellant(s) listed below hereby appeal(s) to the United States Court of Appeals for the Ninth Circuit.

Date case was first filed in U.S. District Court: 12/21/2022

Date of judgment or order you are appealing: 3/05/2026

Docket entry number of judgment or order you are appealing: 149

Fee paid for appeal? *(appeal fees are paid at the U.S. District Court)*

◉ Yes ○ No ○ IFP was granted by U.S. District Court

**List all Appellants** *(List **each** party filing the appeal. Do not use "et al." or other abbreviations.)*

Ashley Guillard, Pro-Se Defendant

Is this a cross-appeal? ○ Yes ◉ No

If yes, what is the first appeal case number?

Was there a previous appeal in this case? ○ Yes ◉ No

If yes, what is the prior appeal case number?

Your mailing address (if pro se):

3262 Westheimer Rd 942

City: Houston State: TX Zip Code: 77098

Prisoner Inmate or A Number (if applicable):

**Signature** /s/Ashley Guillard **Date** 4/06/2026

*Complete and file with the attached representation statement in the U.S. District Court*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

## Form 6. Representation Statement

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form06instructions.pdf*

**Appellant(s)** *(List **each** party filing the appeal, do not use "et al." or other abbreviations.)*

Name(s) of party/parties:

Ashley Guillard, Pro-Se Defendant

Name(s) of counsel (if any):

Pro-Se

Address: 3262 Westheimer Rd, 942, Houston Texas 77098

Telephone number(s): 337.372.3181

Email(s): MSASHLEYJT@GMAIL.COM

Is counsel registered for Electronic Filing in the 9th Circuit? ○ Yes ◉ No

---

**Appellee(s)** *(List only the names of parties and counsel who will oppose you on appeal. List separately represented parties separately.)*

Name(s) of party/parties:

Rebecca Scofield

Name(s) of counsel (if any):

Wendy J. Olson
Cory M. Carone

Address: 101 S. Capitol Boulevard, Suite 1900, Boise Idaho 83702

Telephone number(s): 208.389.9000

Email(s): wendy. olson@stoel.com , cory. carone@stoel.com

*To list additional parties and/or counsel, use next page.*

Continued list of parties and counsel: *(attach additional pages as necessary)*

**Appellants**

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

Is counsel registered for Electronic Filing in the 9th Circuit? ○ Yes ○ No

**Appellees**

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

APPEAL,CONMAG,LCDG,PROTO,PSEFILE,TERMED

# U.S. District Court
# District of Idaho (LIVE) NextGen 1.9 (Moscow - Central)
# CIVIL DOCKET FOR CASE #: 3:22-cv-00521-REP

Scofield v. Guillard
Assigned to: US Magistrate Judge Raymond E Patricco, Jr
Demand: $75,000
Case in other court: United States Court of Appeals, 26-02190
Cause: 28:1332 Diversity-(Citizenship)

Date Filed: 12/21/2022
Date Terminated: 03/05/2026
Jury Demand: Plaintiff
Nature of Suit: 320 Assault Libel & Slander
Jurisdiction: Diversity

**Plaintiff**

**Rebecca Scofield** represented by **Cory Michael Carone**
Stoel Rives LLP
101 S. Capitol Boulevard
Suite 1900
Boise, ID 83702-7705
208-387-4210
Fax: 208-389-9040
Email: cory.carone@stoel.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Wendy Olson**
Stoel Rives, LLP
101 S. Capitol Blvd., Ste. 1900
Boise, ID 83702
208-389-9000
Fax: 208-389-9040
Email: wendy.olson@stoel.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elijah Martin Watkins**
Dorsey & Whitney LLP
101 S. Capitol Blvd
Suite 1100
Boise, ID 83702
208-617-2537
Fax: 208-963-3046
Email: watkins.elijah@dorsey.com
*TERMINATED: 04/09/2024*

V.

**Defendant**

**Ashley Guillard** represented by **Ashley Guillard**
3262 Westheimer Rd

942
Houston, TX 77098
337-372-3181
Email: msashleyjt@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Ashley Guillard** represented by **Ashley Guillard**
PRO SE

V.

**Counter Defendant**

**Rebecca Scofield** represented by **Cory Michael Carone**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Wendy Olson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elijah Martin Watkins**
(See above for address)
*TERMINATED: 04/09/2024*

**ThirdParty Plaintiff**

**Ashley Guillard** represented by **Ashley Guillard**
(See above for address)
PRO SE

V.

**ThirdParty Defendant**

**Cory Carone** represented by **Cory Michael Carone**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ThirdParty Defendant**

**Elijah Watkins** represented by **Elijah Martin Watkins**
(See above for address)
*TERMINATED: 04/09/2024*

**ThirdParty Defendant**

**Wendy Olson** represented by **Wendy Olson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ThirdParty Defendant**

**Rebecca Scofield** represented by **Cory Michael Carone**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Wendy Olson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elijah Martin Watkins**
(See above for address)
*TERMINATED: 04/09/2024*

**Counter Claimant**

**Ashley Guillard** represented by **Ashley Guillard**
(See above for address)
PRO SE

V.

**Counter Defendant**

**Cory Carone** represented by **Cory Michael Carone**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Counter Defendant**

**Elijah Watkins** represented by **Elijah Martin Watkins**
(See above for address)
*TERMINATED: 04/09/2024*

**Counter Defendant**

**Wendy Olson** represented by **Wendy Olson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/21/2022 | 1 | COMPLAINT *and Demand for Jury Trial* against Ashley Guillard ( Filing fee $ 402 receipt number AIDDC-2496012.), filed by Rebecca Scofield. (Attachments: # 1 Summons Summons, # 2 Cover Sheet Civil Cover Sheet)(Olson, Wendy) |
| 12/22/2022 | 2 | Summons Issued as to Ashley Guillard. (Print attached Summons for service.) (km) |
| 01/17/2023 | 3 | DECLARATION of Service filed by Rebecca Scofield . (Olson, Wendy) |
| 01/19/2023 | 4 | MOTION for Entry of Default Wendy Olson appearing for Plaintiff Rebecca Scofield. Responses due by 2/9/2023 (Olson, Wendy) |

| | | |
|---|---|---|
| 01/27/2023 | 5 | Clerk's ENTRY OF DEFAULT as to Ashley Guillard re 4 MOTION for Entry of Default filed by Rebecca Scofield (lm) |
| 02/16/2023 | 6 | Defendant-Counterclaimant Ashley Guillard's Answer, Affirmative Defenses and Counterclaims to Complaint RE: (Dkt. 1 ) Complaint, COUNTERCLAIM against Rebecca Scofield by Ashley Guillard. (Attachments: # 1 Envelope)(lm) |
| 02/16/2023 | 7 | Defendant's Motion for Relief from a Judgment or Order Pursuant to Fed.R.CIV.P.60(b)by Defendant Ashley Guillard. Responses due by 3/9/2023 (lm) |
| 02/16/2023 | 8 | MOTION for Defendant/Counterclaim Plaintiff Ashley Guillard to be Granted CM/ECF E-Flie Access by Defendant Ashley Guillard. Responses due by 3/9/2023 (lm) |
| 02/17/2023 | 9 | RESPONSE to Motion re 7 MOTION for Relief *from Judgment* filed by Rebecca Scofield. Replies due by 3/3/2023.(Olson, Wendy) |
| 02/17/2023 | 10 | MOTION for Default Judgment as to Wendy Olson appearing for Plaintiff Rebecca Scofield. Responses due by 3/10/2023 (Attachments: # 1 Memorandum in Support of Motion for Default Judgment, # 2 Affidavit of Rebecca Scofield)(Olson, Wendy) |
| 02/24/2023 | 11 | NOTICE of Assignment to Magistrate Judge and Requirement for Consent sent to counsel for Ashley Guillard, Rebecca Scofield re 6 Answer to Complaint, Counterclaim Consent/Objection to Magistrate due by 4/25/2023. (km) |
| 02/27/2023 | 12 | MOTION to Strike 6 Answer to Complaint, Counterclaim Wendy Olson appearing for Plaintiff Rebecca Scofield. Responses due by 3/20/2023 (Olson, Wendy) |
| 03/07/2023 | 13 | NOTICE by Rebecca Scofield re 12 MOTION to Strike 6 Answer to Complaint, Counterclaim (Olson, Wendy) |
| 03/14/2023 | 14 | NOTICE by Rebecca Scofield *of Defendant's Acceptance of Service* (Olson, Wendy) |
| 04/11/2023 | 15 | Docket entry only - CONSENT to Magistrate Judge filed. (lm) (Entered: 04/12/2023) |
| 04/19/2023 | 16 | NOTICE by Rebecca Scofield *of Defendant's Failure to Comply with Local Rule 7.1* (Olson, Wendy) |
| 04/24/2023 | 17 | ALL PARTIES HAVE CONSENTED TO PROCEED BEFORE A US MAGISTRATE JUDGE (Attachments: # 1 Consent Filed)(lm) |
| 04/26/2023 | 18 | MEMORANDUM DECISION AND ORDER - Defendants Motion to Set Aside Entry of Default (Dkt. 7 ) is GRANTED. Plaintiffs Motion for Default Judgment (Dkt. 10 ) is DENIED AS MOOT. Defendants Motion for CM/ECF Access (Dkt. 8 ) is GRANTED. Defendant shall immediately contact the Clerks Office for instructions on how to request a CM/ECF account within the District of Idaho. Plaintiffs Motion to Strike (Dkt. 12 ) is GRANTED. Defendant shall formally respond to Plaintiffs Complaint within 21 days of this Memorandum Decision and Order, unless otherwise ordered by the Court. Signed by Judge Raymond Edward Patricco, Jr. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (lm) |
| 05/01/2023 | 19 | NOTICE of Change of Address by Ashley Guillard - Address has been updated (Attachments: # 1 Copy of Envelope)(lm) |
| 05/16/2023 | 20 | *Defendants* ANSWER to 1 Complaint *Docket no. 1 Scofield v Guillard*, First THIRD PARTY COMPLAINT *Guillard v Scofield et al* against Rebecca Scofield, Cory Carone, Elijah Watkins, Wendy Olson, First COUNTERCLAIM *Guillard v Scofield et al* against Cory Carone, Elijah Watkins, Wendy Olson by Ashley Guillard.(Guillard, Ashley) |
| 06/01/2023 | 21 | LITIGATION ORDER AND NOTICE OF TELEPHONIC SCHEDULING CONFERENCE - The Court will conduct a telephonic scheduling conference on |

| | | |
|---|---|---|
| | | Thursday, July 6, 2023, 1:30 P.M. *Mountain time, for purpose of confirming the deadlines proposed by the parties in the JOINT Litigation Plan. On or before Thursday, June 29, 2023, the parties must file with the Court the JOINT Litigation Plan and Discovery Plans. Signed by US Magistrate Judge Raymond Edward Patricco, Jr. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (lm) |
| 06/06/2023 | 22 | Motion to Dismiss for Failure to State a Claim Wendy Olson appearing for Plaintiff Rebecca Scofield. Responses due by 6/27/2023 (Attachments: # 1 Memorandum in Support of Motion to Dismiss Counterclaims)(Olson, Wendy) |
| 06/07/2023 | 23 | STATUS REPORT *SERVICE OF PROCESS FOR WENDY J. OLSON, CORY M. CARONE, AND ELIJAH M. WATKINS* by Ashley Guillard. (Guillard, Ashley) |
| 06/08/2023 | 24 | Summons Issued as to Cory Carone, Ashley Guillard, Wendy Olson. (Print attached Summons for service.) (Attachments: # 1 Summons Watkins, # 2 Summons Carone)(lm) |
| 06/13/2023 | 25 | MOTION to Quash *Summonses* Wendy Olson appearing for Plaintiff Rebecca Scofield. Responses due by 7/5/2023 (Olson, Wendy) |
| 06/15/2023 | 26 | SUMMONS Returned Executed by Ashley Guillard. Cory Carone served on 6/9/2023, answer due 6/30/2023. (Guillard, Ashley) |
| 06/15/2023 | 27 | SUMMONS Returned Executed by Ashley Guillard. Wendy Olson served on 6/9/2023, answer due 6/30/2023. (Guillard, Ashley) |
| 06/15/2023 | 28 | SUMMONS Returned Executed by Ashley Guillard. Elijah Watkins served on 6/9/2023, answer due 6/30/2023. (Guillard, Ashley) |
| 06/16/2023 | 29 | SCHEDULING CONFERENCE FORM - LITIGATION PLAN by Rebecca Scofield. (Olson, Wendy) |
| 06/16/2023 | 30 | DISCOVERY PLAN by Rebecca Scofield . (Olson, Wendy) |
| 06/17/2023 | 31 | DISCOVERY PLAN by Ashley Guillard . (Guillard, Ashley) |
| 06/27/2023 | 32 | STRICKEN ~~RESPONSE to Motion re 22 Motion to Dismiss for Failure to State a Claim filed by Ashley Guillard. Replies due by 7/11/2023.(Guillard, Ashley)~~ Modified on 6/30/2023 (lm). per DEO 34 |
| 06/29/2023 | 33 | DOCKET ENTRY ORDER: Defendant's 20 Answer to Complaint, Third Party Complaint, Counterclaim names additional parties to the action. Therefore, the Clerk's Office is directed to issue a Notice of Assignment and Requirement for Consent to these new parties. Additionally, the consent period shall be reduced from 60 days to 14 days. Signed by US Magistrate Judge Raymond E. Patricco, Jr. (dg) |
| 06/29/2023 | 34 | DOCKET ENTRY ORDER STRIKING 32 Defendant's/Counterclaimant's Response to Motion. The Response exceeds the page limits outlined in Local Civil Rule 7.1. Defendant/Counterclaimant shall file a compliant Response on or before July 6, 2023. Said Response shall not include any arguments not already raised within the original Response. Plaintiff's Reply in support of the Motion is therefore due on or before July 20, 2023. Signed by US Magistrate Judge Raymond E. Patricco, Jr. (dg) |
| 06/29/2023 | 35 | RESPONSE to Motion re 22 Motion to Dismiss for Failure to State a Claim filed by Ashley Guillard. Replies due by 7/20/2023.(Guillard, Ashley) Modified on 6/30/2023 to change the reply deadline (lm). |
| 06/29/2023 | | Set/Reset Deadlines as to 22 Motion to Dismiss for Failure to State a Claim . Defendant's/ Counter claimant's Responses are due by 7/6/2023. Plaintiff's Replies are due by 7/20/2023. (lm) (Entered: 06/30/2023) |

| | | |
|---|---|---|
| 06/30/2023 | 36 | RESPONSE to Motion re 25 MOTION to Quash *Summonses* filed by Ashley Guillard. Replies due by 7/14/2023. (Attachments: # 1 Exhibit A: Documentary Evidence, # 2 Exhibit B: Documentary Evidence)(Guillard, Ashley) |
| 06/30/2023 | 37 | **DISREGARD** NOTICE of Assignment to Magistrate Judge and Requirement for Consent sent to counsel for Cory Carone, Ashley Guillard, Wendy Olson, Rebecca Scofield, Elijah Watkins re 20 Answer to Complaint,, Third Party Complaint,, Counterclaim, Consent/Objection to Magistrate due by 7/14/2023. (lm) Modified on 6/30/2023, see corrective entry (jd). |
| 06/30/2023 | 38 | SCHEDULING ORDER - Dispositive Motion Deadline: 1/12/24. Amendment of Pleadings and Joinder of Parties: 8/11/23. All fact discovery must be completed by 12/15/23. The Court will conduct a telephonic status conference with the parties on 10/5/23 at 10:00 a.m. Mountain Time for the purpose of inquiring about the status of discovery. IT IS FURTHER ORDERED that the Telephonic Scheduling Conference scheduled for 7/6/23 at 1:30 p.m. (Mountain) is VACATED. Signed by US Magistrate Judge Raymond Edward Patricco, Jr. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (hs) |
| 06/30/2023 | | Set/Reset Hearings:( Telephonic Status Conference set for 10/5/2023 10:00 AM in Telephonic Hearing - Boise Chambers before US Magistrate Judge Raymond Edward Patricco Jr..), ***Deadlines terminated. (hs) |
| 06/30/2023 | | CORRECTIVE ENTRY - The entry docket number 37 Notice of Assignment Setting Deadline, has a new deadline based on the order entered at dkt. 38, see footnote 1. Please disregard. (jd) |
| 06/30/2023 | 39 | DOCKET TEXT NOTICE of Hearing on 25 MOTION to Quash *Summonses*, 22 Motion to Dismiss for Failure to State a Claim : Video Motion Hearing set for 7/21/2023 10:00 AM (Mountain Time) via Video Zoom before US Magistrate Judge Raymond Edward Patricco Jr. Despite this setting, the Court reserves the right to issue a decision on any of these motions in the event it determines that a hearing is unnecessary.<br><br>Counsel to receive video link via separate notification. Members of the public may use the following to attend this matter via Audio ONLY: 1-669-254-5252, Meeting ID:160 114 9423. Persons granted remote access to proceedings are reminded of the general prohibition under federal law and Local Rule 83.1 against photographing, recording, and rebroadcasting of court proceedings. (jh) |
| 06/30/2023 | 40 | NOTICE of Assignment to Magistrate Judge and Requirement for Consent sent to counsel for Cory Carone, Wendy Olson, Rebecca Scofield, Elijah Watkins re 38 Scheduling Order, 20 Answer to Complaint. Consent/Objection to Magistrate due by 8/8/2023. (jd) |
| 07/03/2023 | 41 | MOTION to Continue *Deadline for Filing Responsive Pleading* Wendy Olson appearing for Plaintiff Rebecca Scofield. Responses due by 7/24/2023 (Olson, Wendy) |
| 07/05/2023 | 42 | Docket entry only - CONSENT to Magistrate Judge filed. (lm) (Entered: 07/06/2023) |
| 07/06/2023 | 43 | DOCKET ENTRY ORDER GRANTING 41 Motion to Continue. In light of the pending Motion to Quash in particular, the deadline for Ms. Olson, Mr. Watkins, and Mr. Carone to respond to Defendant's counterclaims against them is continued until after the Court decides the Motion to Quash. By separate order, the Court will re-set this deadline, if necessary. Signed by US Magistrate Judge Raymond Edward Patricco, Jr. (dg) |

| | | |
|---|---|---|
| 07/10/2023 | 44 | REPLY to Response to Motion re 25 MOTION to Quash *Summonses for Wendy J. Olson, Elijah M. Watkins, and Cory M. Carone* filed by Rebecca Scofield.Motion Ripe Deadline set for 7/11/2023.(Olson, Wendy) |
| 07/13/2023 | 45 | MOTION for Sanctions Wendy Olson appearing for Plaintiff Rebecca Scofield. Responses due by 8/3/2023 (Attachments: # 1 Memorandum in Support of Motion for Sanctions)(Olson, Wendy) |
| 07/14/2023 | 46 | REPLY to Response to Motion re 22 Motion to Dismiss for Failure to State a Claim filed by Rebecca Scofield.Motion Ripe Deadline set for 7/17/2023.(Olson, Wendy) |
| 07/21/2023 | 47 | Minute Entry for proceedings held before US Magistrate Judge Raymond Edward Patricco, Jr: Motion Hearing held on 7/21/2023 re 25 MOTION to Quash *Summonses* filed by Rebecca Scofield, 22 Motion to Dismiss for Failure to State a Claim filed by Rebecca Scofield. (ESR jh.) Audio File Location via Zoom/audio only. (jh) |
| 07/27/2023 | 48 | MOTION to Quash *or Modify Subpoena to Meta Platforms, Inc.* Wendy Olson appearing for Plaintiff Rebecca Scofield. Responses due by 8/17/2023 (Attachments: # 1 Memorandum in Support of Motion to Quash or Modify Subpoena to Meta Platforms, Inc., # 2 Declaration of Wendy J. Olson, # 3 Exhibit A to Declaration of Wendy J. Olson)(Olson, Wendy) |
| 08/08/2023 | 49 | MEMORANDUM DECISION AND ORDER - Plaintiffs Motion to Dismiss Defendants Counterclaims (Dkt. 22 ) is GRANTED, in part, and DENIED, in part, as follows:Defendants counterclaims against Plaintiff are dismissed with prejudice. In this respect, Plaintiffs Motion to Dismiss Defendants Counterclaims (Dkt. 22 ) is GRANTED. An attorneys fees award against Defendant is not warranted at this time. In this respect, Plaintiffs Motion to Dismiss Defendants Counterclaims (Dkt. 22 ) is DENIED. Plaintiffs Motion to Quash Summonses for Wendy J. Olson, Elijah M. Watkins, and Cory M. Carone (Dkt. 25 ) is GRANTED. Because Plaintiffs counsel is not a party to the action, any consent deadline directed at Plaintiffs counsel is inapplicable and hereby vacated. Consistent with paragraph 4 of the Courts Scheduling Order, Plaintiffs Proposed Discovery Plan (Dkt. 30 ) controls, unless otherwise ordered. Signed by US Magistrate Judge Raymond Edward Patricco, Jr. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (lm) |
| 08/21/2023 | 50 | First MOTION to Dismiss *Complaint (Dkt. 1)* Ashley Guillard appearing for Defendant Ashley Guillard. Responses due by 9/11/2023 (Attachments: # 1 Memorandum in Support of 12(b)(1) Motion to Dismiss)(Guillard, Ashley) |
| 09/11/2023 | 51 | RESPONSE to Motion re 50 First MOTION to Dismiss *Complaint (Dkt. 1)* filed by Rebecca Scofield. Replies due by 9/25/2023.(Olson, Wendy) |
| 09/15/2023 | 52 | RESPONSE to Motion re 48 MOTION to Quash *or Modify Subpoena to Meta Platforms, Inc.* filed by Ashley Guillard. Replies due by 9/29/2023. (Attachments: # 1 Exhibit A-Request for Production of Content from Meta)(Guillard, Ashley) |
| 09/29/2023 | 53 | REPLY to Response to Motion re 48 MOTION to Quash *or Modify Subpoena to Meta Platforms, Inc.* filed by Rebecca Scofield.Motion Ripe Deadline set for 10/2/2023.(Olson, Wendy) |
| 10/05/2023 | 54 | DOCKET TEXT Minute Entry for proceedings held before US Magistrate Judge Raymond Edward Patricco, Jr: Status Conference held on 10/5/2023. Wendy Olson and Cory Carone appeared for plaintiff, and Ashley Guilliard appeared pro se (defendant). The Court held the first status conference in this case. Outstanding motions were discussed with counsel and defendant and an Order will be issued in due course. Plaintiffs counsel did not have any updates to apprize the Court. Defendant apprized the Court regarding discovery and privacy concerns. ( Video Status Conference set for 12/7/2023 |

| | | |
|---|---|---|
| | | 11:00 AM (MT) via Video Zoom before US Magistrate Judge Raymond Edward Patricco Jr. Counsel to receive Zoom link prior to status conference.). (ESR jh.) Audio File Location via Zoom. (jh) |
| 10/06/2023 | 55 | MEMORANDUM DECISION AND ORDER RE: IT IS HEREBY ORDERED that: (i) Plaintiffs Motion for Sanctions (Dkt. 45 ) is DENIED; and (ii) Plaintiffs Motion to Quash or Modify subpoena to Meta Platforms, Inc. (Dkt. 48 ) is GRANTED. Signed by US Magistrate Judge Raymond Edward Patricco, Jr. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (jd) (Entered: 10/10/2023) |
| 10/10/2023 | 56 | MOTION for Partial Summary Judgment Wendy Olson appearing for Plaintiff Rebecca Scofield. Responses due by 10/31/2023 (Attachments: # 1 Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment, # 2 Statement of Undisputed Material Facts, # 3 Declaration of Olson ISO Motion for Partial Summary Judgment, # 4 Exhibit A to Olson Declaration, # 5 Exhibit B to Olson Declaration, # 6 Exhibit C to Olson Declaration, # 7 Exhibit D to Olson Declaration, # 8 Exhibit E to Olson Declraration, # 9 Exhibit F to Olson Declaration, # 10 Exhibit G to Olson Declaration, # 11 Exhibit H to Olson Declaration, # 12 Exhibit I to Olson Declaration, # 13 Exhibit J to Olson Declaration, # 14 Exhibit K to Olson Declaration, # 15 Exhibit L to Olson Declaration, # 16 Exhibit M to Olson Declaration, # 17 Exhibit N to Olson Declaration, # 18 Exhibit O to Olson Declaration, # 19 Declaration of Scofield ISO Motion for Partial Summary Judgment, # 20 Exhibit A to Scofield Declaration, # 21 Exhibit B to Scofield Declaration) (Olson, Wendy) (1 flash-drive for exhibits E-M received on 10/11/2023 and maintained in clerk's office file room.) Modified on 10/11/2023 to note date received. (dmv). |
| 10/31/2023 | 57 | RESPONSE to Motion re 56 MOTION for Partial Summary Judgment filed by Ashley Guillard. Replies due by 11/14/2023.(Guillard, Ashley) |
| 11/13/2023 | 58 | REPLY to Response to Motion re 56 MOTION for Partial Summary Judgment filed by Rebecca Scofield.Motion Ripe Deadline set for 11/14/2023. (Attachments: # 1 Declaration of Olson, # 2 Exhibit A to Declaration of Olson, # 3 Exhibit B to Declaration of Olson, # 4 Exhibit C to Declaration of Olson, # 5 Exhibit D to Declaration of Olson) (Olson, Wendy) |
| 11/13/2023 | 59 | MEMORANDUM DECISION AND ORDER RE: DEFENDANTS MOTION TO SET ASIDE AND MOTION TO DIMSISS - Based on the foregoing, IT IS HEREBY ORDERED that Defendant Ashley Guillards Motion to Set Aside and Motion to Dismiss (Dkt. 50 ) is DENIED. Signed by US Magistrate Judge Raymond Edward Patricco, Jr. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (lm) |
| 11/25/2023 | 60 | DOCKET TEXT AMENDED NOTICE of Hearing: Video Status Conference reset for 12/7/2023 10:30 AM (Mountain Time) via Zoom before US Magistrate Judge Raymond Edward Patricco Jr. The date remains the same, only the time has changed. Zoom link will be sent within 24 hours prior to status conference. (jh) |

| | | |
|---|---|---|
| 12/07/2023 | 61 | DOCKET TEXT Minute Entry for proceedings held before US Magistrate Judge Raymond Edward Patricco, Jr: Status Conference held on 12/7/2023. Appearances: Wendy Olson, Elijah Watkins, and Corey Carone for the plaintiff, and Ashley Guillard (pro se) defendant.The Court discussed several deadlines which are forthcoming as well as plaintiff's pending Motion for Summary Judgment. The Court extended time for defendant to respond to requests for admission to Friday, December 15, 2023. Dispositive motions deadline will be extended to January 12 in which to amend the plaintiffs Motion for Summary Judgment. The plaintiff requested reconsideration as stated on the record. ( Video Status Conference set for 3/7/2024 10:00 AM in Video Zoom before US Magistrate Judge Raymond Edward Patricco Jr.). (ESR jh.) Audio File Location via Zoom. (jh) |
| 12/08/2023 | 62 | DOCKET ENTRY ORDER: As stated during the 12/7/23 status conference, pursuant to FRCP 36(a)(3), IT IS HEREBY ORDERED that Defendant shall respond to Plaintiff's Requests for Admission, consistent with Rule 36, on or before 12/15/23. Failure to respond to Plaintiff's Requests for Admission will result in the matters being admitted. Plaintiff may file an amended/renewed Motion for Summary Judgment by 1/12/24 to account for any responses to Plaintiff's Requests for Admission. All other deadlines remain in effect unless otherwise ordered by the Court. Signed by US Magistrate Judge Raymond E. Patricco, Jr. (dg) |
| 01/12/2024 | 63 | Amended MOTION for Partial Summary Judgment *re Docket No. 56* Wendy Olson appearing for Plaintiff Rebecca Scofield. Responses due by 2/2/2024 (Attachments: # 1 Memorandum in Support of Plaintiff's Amended Motion for Partial Summary Judgment, # 2 Amended Statement of Undisputed Material Facts, # 3 Declaration of Olson, # 4 Exhibit A to Olson Declaration, # 5 Exhibit B to Olson Declaration, # 6 Exhibit C to Olson Declaration, # 7 Exhibit D to Olson Declaration, # 8 Exhibit E to Olson Declaration, # 9 Exhibit F to Olson Declaration, # 10 Exhibit G to Olson Declaration, # 11 Exhibit H to Olson Declaration, # 12 Exhibit I to Olson Declaration, # 13 Exhibit J to Olson Declaration, # 14 Exhibit K to Olson Declaration, # 15 Exhibit L to Olson Declaration, # 16 Exhibit M to Olson Declaration, # 17 Exhibit N to Olson Declaration, # 18 Exhibit O to Olson Declaration, # 19 Exhibit P to Olson Declaration, # 20 Exhibit Q to Olson Declaration, # 21 Exhibit R to Olson Declaration, # 22 Exhibit S to Olson Declaration, # 23 Exhibit T to Olson Declaration, # 24 Declaration of Scofield, # 25 Exhibit A to Scofield Declaration, # 26 Exhibit B to Scofield Declaration)(Olson, Wendy) |
| 01/12/2024 | 64 | MOTION for Leave to File *Amended Complaint to Add Punitive Damages* Wendy Olson appearing for Plaintiff Rebecca Scofield. Responses due by 2/2/2024 (Attachments: # 1 Exhibit A to Motion for Leave to Amend Complaint, # 2 Exhibit B to Motion for Leave to Amend Complaint, # 3 Memorandum in Support of Motion for Leave to Amend Complaint, # 4 Olson Declaration, # 5 Exhibit A to Olson Declaration, # 6 Exhibit B to Olson Declaration, # 7 Exhibit C to Olson Declaration, # 8 Exhibit D to Olson Declaration, # 9 Exhibit E to Olson Declaration, # 10 Exhibit F to Olson Declaration, # 11 Exhibit G to Olson Declaration, # 12 Exhibit H to Olson Declaration, # 13 Exhibit I to Olson Declaration, # 14 Exhibit J to Olson Declaration, # 15 Exhibit K to Olson Declaration, # 16 Exhibit L to Olson Declaration, # 17 Exhibit M to Olson Declaration, # 18 Exhibit N to Olson Declaration, # 19 Exhibit O to Olson Declaration, # 20 Exhibit P to Olson Declaration, # 21 Exhibit Q to Olson Declaration, # 22 Exhibit R to Olson Declaration, # 23 Exhibit S to Olson Declaration, # 24 Exhibit T to Olson Declaration) (Olson, Wendy) Modified on 1/16/2024, lodging received 2 flash drives re: dkt. 64-4 and are maintained in the clerk's office file room (jd). |
| 02/02/2024 | 65 | RESPONSE to Motion re 63 Amended MOTION for Partial Summary Judgment *re Docket No. 56* filed by Ashley Guillard. Replies due by 2/16/2024. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C, # 4 Exhibit Exhibit D, # 5 |

| | | |
|---|---|---|
| | | Exhibit Exhibit E, # 6 Exhibit Exhibit F, # 7 Exhibit Exhibit G, # 8 Exhibit Exhibit H) (Guillard, Ashley) |
| 02/02/2024 | 66 | RESPONSE to Motion re 64 MOTION for Leave to File *Amended Complaint to Add Punitive Damages* filed by Ashley Guillard. Replies due by 2/16/2024. (Attachments: # 1 Exhibit A- Document)(Guillard, Ashley) |
| 02/16/2024 | 67 | REPLY to Response to Motion re 63 Amended MOTION for Partial Summary Judgment *re Docket No. 56* filed by Rebecca Scofield.Motion Ripe Deadline set for 2/20/2024. (Olson, Wendy) |
| 02/16/2024 | 68 | REPLY to Response to Motion re 64 MOTION for Leave to File *Amended Complaint to Add Punitive Damages* filed by Rebecca Scofield.Motion Ripe Deadline set for 2/20/2024.(Olson, Wendy) |
| 03/05/2024 | 69 | DOCKET TEXT NOTICE VACATING the 3/7/2024 Video Status Conference before the Honorable Raymond E. Patricco. (jh) |
| 03/06/2024 | 70 | DOCKET ENTRY ORDER DENYING AS MOOT 56 Motion for Partial Summary Judgment. Signed by US Magistrate Judge Raymond E. Patricco, Jr.(dg) |
| 03/22/2024 | 71 | DOCKET TEXT NOTICE of Hearing on Motion 63 Amended MOTION for Partial Summary Judgment *re Docket No. 56*, 64 MOTION for Leave to File *Amended Complaint to Add Punitive Damages* : Video Motion Hearing set for 4/16/2024 10:00 AM (Mountain Time) via Video Zoom before US Magistrate Judge Raymond Edward Patricco Jr.<br><br>Parties to receive video link via separate notification. Members of the public may use the following to attend this matter via Audio ONLY: 1-669-254-5252, Meeting ID: 161 515 2116. Persons granted remote access to proceedings are reminded of the general prohibition under federal law and Local Rule 83.1 against photographing, recording, and rebroadcasting of court proceedings. (jh) |
| 04/08/2024 | 72 | NOTICE by Rebecca Scofield *of Withdrawal for E. Watkins and Request for Removal of Papers* (Watkins, Elijah) |
| 04/16/2024 | 73 | Minute Entry for proceedings held before US Magistrate Judge Raymond Edward Patricco, Jr: Motion Hearing held on 4/16/2024 re 63 Amended MOTION for Partial Summary Judgment *re Docket No. 56* filed by Rebecca Scofield, 64 MOTION for Leave to File *Amended Complaint to Add Punitive Damages* filed by Rebecca Scofield. Motions taken UNDER ADVISEMENT. (ESR jh.) Audio File Location via Zoom. (jh) |
| 06/06/2024 | 74 | MEMORANDUM DECISION AND ORDER - Plaintiffs Amended Motion for Partial Summary Judgment (Dkt. 63 ) is GRANTED on the issue of liability only; and Plaintiffs Motion for Leave to Amend Complaint to Add Punitive Damages (Dkt. 64 ) is GRANTED. Signed by US Magistrate Judge Raymond Edward Patricco, Jr. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (lm) |
| 06/13/2024 | 75 | MOTION for Reassignment to a U.S. District Judge. by Defendant Ashley Guillard. Responses due by 7/5/2024 (lm) Modified on 8/19/2024 to remove terminated date. Motion remains pending (km). (Entered: 06/14/2024) |
| 06/21/2024 | 76 | AMENDED COMPLAINT *and Demand for Jury Trial* against Ashley Guillard, filed by Rebecca Scofield.(Olson, Wendy) |
| 06/24/2024 | 77 | MOTION to Amend/Correct 74 Order on Motion for Partial Summary Judgment,, Order on Motion for Leave to File, Ashley Guillard appearing for Defendant Ashley Guillard. |

| | | |
|---|---|---|
| | | Responses due by 7/15/2024 (Attachments: # 1 Memorandum in Support, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C)(Guillard, Ashley) |
| 06/24/2024 | 78 | TRANSCRIPT REQUEST by Rebecca Scofield for proceedings held on 04/16/24 before Judge Patricco.. (Olson, Wendy) |
| 06/28/2024 | 79 | Notice of Filing of Official Transcript of Proceedings held on 04/16/2024 before Judge Raymond E. Patricco. Transcriber Tamara Weber, Email tammy@canyontranscription.com. Transcript may be viewed at the court public terminal or purchased through the Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. This transcript is not available to the general public and as such is sealed until release of transcript restriction re 73 Motion Hearing,. Redaction Request due 7/19/2024. Redacted Transcript Deadline set for 7/29/2024. Release of Transcript Restriction set for 9/26/2024. (dmv) |
| 07/02/2024 | 80 | RESPONSE to Motion re 75 MOTION to Reassign Case filed by Rebecca Scofield. Replies due by 7/16/2024.(Olson, Wendy) |
| 07/08/2024 | 81 | SECOND MOTION to Reassign Case Ashley Guillard appearing for Defendant Ashley Guillard. Responses due by 7/29/2024 (Attachments: # 1 Envelope)(lm) |
| 07/09/2024 | | CD (Audio) Hearing Request. Hearing Date: 04/16/2024 Hearing Judge: Patricco. CD will be mailed to: 3262 Westheimer Rd 942 Houston TX 77098 (Filing fee $ 32 receipt number AIDDC-2776989.). (Guillard, Ashley) |
| 07/15/2024 | 82 | RESPONSE to Motion re 77 MOTION to Amend/Correct 74 Order on Motion for Partial Summary Judgment,, Order on Motion for Leave to File, filed by Rebecca Scofield. Replies due by 7/29/2024.(Olson, Wendy) |
| 07/15/2024 | 83 | RESPONSE to Motion re 81 MOTION to Reassign Case filed by Rebecca Scofield. Replies due by 7/29/2024.(Olson, Wendy) |
| 07/16/2024 | 84 | REPLY to Response to Motion re 75 MOTION to Reassign Case, 81 MOTION to Reassign Case filed by Ashley Guillard.Motion Ripe Deadline set for 7/17/2024. (Guillard, Ashley) |
| 07/16/2024 | 85 | REPLY to Response to Motion re 81 MOTION to Reassign Case, 75 MOTION to Reassign Case filed by Ashley Guillard.Motion Ripe Deadline set for 7/17/2024. (Guillard, Ashley) |
| 07/18/2024 | 86 | REPLY to Response to Motion re 77 MOTION to Amend/Correct 74 Order on Motion for Partial Summary Judgment,, Order on Motion for Leave to File, *Reply* filed by Ashley Guillard.Motion Ripe Deadline set for 7/19/2024.(Guillard, Ashley) |
| 08/19/2024 | 87 | ORDER OF REFERRAL - IT IS HEREBY ORDERED that Defendants Request for Reassignment to a U.S. District Judge (Dkt. 75 ) and, to the extent necessary to address that Request, Defendants Motion to Alter or Amend Judgment (Dkt. 77 ), be referred to a United States District Judge for resolution as necessary. IT IS FURTHER HEREBY ORDERED that Defendants identical Request for Reassignment to a U.S. District Judge (Dkt. 81 ) is DENIED AS MOOT. Motions referred to B. Lynn Winmill. Signed by US Magistrate Judge Raymond Edward Patricco, Jr. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (lm) |
| 11/13/2024 | 88 | MEMORANDUM DECISION AND ORDER - Guillards Motion for Reassignment to a District Judge (Dkt. 75 ) is DENIED. Signed by Judge Amanda K Brailsford. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (lm) |

| | | |
|---|---|---|
| 02/04/2025 | 89 | MEMORANDUM DECISION AND ORDER RE: DEFENDANTS MOTION TO ALTER OR AMEND JUDGMENT - Based on the foregoing, IT IS HEREBY ORDERED that Defendants Motion to Alter or Amend Judgment (Dkt. 77 ) is DENIED. Signed by US Magistrate Judge Raymond Edward Patricco, Jr. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (lm) |
| 02/19/2025 | 90 | DOCKET ENTRY ORDER: The parties shall meet and confer to discuss any outstanding issues ahead of setting a trial date. After doing so, on or before March 11, 2025, the parties shall file a joint status report with the parties' respective positions moving forward. Signed by US Magistrate Judge Raymond E. Patricco, Jr. (dg) |
| 02/21/2025 | | Set Deadlines/Hearings: Status Report due by 3/11/2025. per DEO 90 (lm) |
| 03/11/2025 | 91 | STATUS REPORT *(Joint)* by Rebecca Scofield. (Olson, Wendy) |
| 03/15/2025 | 92 | Second MOTION for Reconsideration re 74 Order on Motion for Partial Summary Judgment,, Order on Motion for Leave to File, Ashley Guillard appearing for Defendant Ashley Guillard. Responses due by 4/7/2025 (Attachments: # 1 Memorandum in Support, # 2 Exhibit A-L ECF Exhibits)(Guillard, Ashley) |
| 04/07/2025 | 93 | RESPONSE to Motion re 92 Second MOTION for Reconsideration re 74 Order on Motion for Partial Summary Judgment,, Order on Motion for Leave to File, filed by Rebecca Scofield. Replies due by 4/21/2025. (Attachments: # 1 Declaration of Olson in Support of Opposition to Motion for Reconsideration)(Olson, Wendy) |
| 04/21/2025 | 94 | REPLY to Response to Motion re 92 Second MOTION for Reconsideration re 74 Order on Motion for Partial Summary Judgment,, Order on Motion for Leave to File, filed by Ashley Guillard.Motion Ripe Deadline set for 4/22/2025. (Attachments: # 1 Affidavit In Support of Defendants Motion for Reconsideration)(Guillard, Ashley) (Entered: 04/22/2025) |
| 05/15/2025 | 95 | NOTICE by Ashley Guillard re 93 Response to Motion, 94 Reply to Response to Motion, 92 Second MOTION for Reconsideration re 74 Order on Motion for Partial Summary Judgment,, Order on Motion for Leave to File, (Attachments: # 1 Exhibit A: Motion For Access to Non-Disclosed Documents, # 2 Exhibit B: Order Striking Motion for Access to Non-Disclosed Documents, # 3 Exhibit C: Confirmation RE: Request for Access to Non-Disclosed Public Records)(Guillard, Ashley) |
| 05/30/2025 | 96 | MEMORANDUM DECISION AND ORDER RE: DEFENDANTS RULE 60(b)(2) MOTION FOR RECONSIDERATION OF PARTIAL SUMMARY JUDGMENT - IT IS HEREBY ORDERED that Defendants Rule 60(b)(2) Motion for Reconsideration of Partial Summary Judgment (Dkt. 92 ) is DENIED. Signed by US Magistrate Judge Raymond E. Patricco. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (lm) |
| 06/12/2025 | 97 | Defendant's Objections to Magistrate's Decision and Order on May 30, 2025 by Ashley Guillard re 96 Order on Motion for Reconsideration, (Notice sent by e-mail to Court Reporter) (Guillard, Ashley) Modified on 6/13/2025 (lm). Modified on 6/17/2025 to update docket text (km). |

| | | |
|---|---|---|
| 06/12/2025 | | DISREGARD per 6/17/25 Corrective Entry - CORRECTIVE ENTRY - The entry docket number 97 APPEAL OF MAGISTRATE JUDGE DECISION to District Court by Ashley Guillard re 96 Order on Motion for Reconsideration, (Notice sent by e-mail to Court Reporter) filed by Ashley Guillard was filed incorrectly in this case. The filing party shall re-submit their correct filing using the event Notice of Appeal. This event can be found under Civil Events-Other Filings-Appeal Documents-Notice of Appeal(lm) Modified on 6/17/2025 (km). (Entered: 06/13/2025) |
| 06/13/2025 | 98 | STATUS REPORT *(Joint)* by Rebecca Scofield. (Olson, Wendy) |
| 06/17/2025 | | CORRECTIVE ENTRY - Please Disregard the corrective entry entered on 6/12/25. (km) |
| 06/17/2025 | 99 | ORDER RE: DEFENDANT'S OBJECTIONS TO MAGISTRATE'S DECISION AND ORDER ON MAY 30, 2025. IT IS HEREBY ORDERED that Ashley Guillard's Objectionsto Magistrate's Decision and Order on May 30, 2025 (Dkt. 97 ) are REJECTED. Signed by US Magistrate Judge Raymond E. Patricco. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (km) |
| 08/12/2025 | 100 | ORDER SETTING TRIAL - A four-day jury trial is set for Tuesday, February 24, 2026, beginning at 9:00 a.m. (Pacific) in Coeur dAlene, Idaho. A pre-trial conference is scheduled to take place at 10:00 a.m. (Mountain) on February 5, 2026, The pretrial conference will be held via zoom. A second, in-person pretrial conference is scheduled to take pace at 10:00 a.m. (Pacific) on February 23, 2026. Rule 702 motions shall be filed with the Court by September 2, 2025. The parties shall exchange witness lists and file copies of these lists with the Court on or before October 7, 2025. All exhibit lists shall be filed with the Court by October 7, 2025. All proposed jury instructions shall be filed with the Court by October 7, 2025. Proposed voir dire shall be filed with the Court by October 7, 2025. Trial briefs shall be filed with the Court by October 14, 2025. Motions in limine shall be filed with the Court by October 14, 2025. The parties are ordered to notify the Court on or before January 30, 2026 that the case has either settled or will definitely go to trial. Signed by US Magistrate Judge Raymond E. Patricco. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (lm) |
| 09/02/2025 | 101 | ORDER RE: VENUE - a four-day jury trial is set for Tuesday, February 24, 2026, beginning at 9:00 a.m. (Mountain) in Boise, Idaho; and (ii) the second, in person pre-trial conference is scheduled to take place at 10:00 (Mountain) on February 23, 2026 in Boise, Idaho. All other deadlines remain in-effect unless otherwise ordered. Signed by US Magistrate Judge Raymond E. Patricco. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (jd) |
| 09/02/2025 | | ***Deadlines terminated., Set Deadlines/Hearings: ( Pretrial Conference set for 2/23/2026 10:00 AM in Boise - Courtroom 7 before US Magistrate Judge Raymond E. Patricco.) (jd) |
| 09/02/2025 | 102 | First MOTION to Exclude *Expert Testimony of Rebecca Bohn and Rebecca Tallent* Ashley Guillard appearing for Defendant Ashley Guillard. Responses due by 9/23/2025 (Attachments: # 1 Memorandum in Support 702 Motion to Exclude, # 2 Exhibit A: Plaintiff's Expert Disclosures, # 3 Exhibit B: DSM-5, # 4 Exhibit C: PTSD Guide, # 5 Exhibit D: ICD-10, # 6 Exhibit E: Plaintiff Scofield's Go Fund Me)(Guillard, Ashley) |
| 09/16/2025 | 103 | RESPONSE to Motion re 102 First MOTION to Exclude *Expert Testimony of Rebecca Bohn and Rebecca Tallent* filed by Rebecca Scofield. Replies due by 9/30/2025. (Attachments: # 1 Affidavit Olson Declaration in Support of Plaintiff's Opposition, # 2 Exhibit Exhibit A to Olson Declaration)(Olson, Wendy) |

| | | |
|---|---|---|
| 09/23/2025 | 104 | REPLY to Response to Motion re 102 First MOTION to Exclude *Expert Testimony of Rebecca Bohn and Rebecca Tallent* filed by Ashley Guillard.Motion Ripe Deadline set for 9/24/2025.(Guillard, Ashley) |
| 10/07/2025 | 105 | Witness List (sealed) by Rebecca Scofield. (Attachments: # 1 Supplement to Plaintiff's Witness List)(Olson, Wendy) |
| 10/07/2025 | 106 | Exhibit List by Rebecca Scofield.. (Olson, Wendy) |
| 10/07/2025 | 107 | Proposed Jury Instructions by Rebecca Scofield. (Olson, Wendy) |
| 10/07/2025 | 108 | Special Verdict (Proposed) by Plaintiff Rebecca Scofield. (Olson, Wendy) |
| 10/07/2025 | 109 | Proposed Voir Dire by Rebecca Scofield. (Olson, Wendy) |
| 10/09/2025 | 110 | MOTION for Protective Order Wendy Olson appearing for Plaintiff Rebecca Scofield. Responses due by 10/30/2025 (Attachments: # 1 Exhibit A - Proposed Protective Order, # 2 Exhibit B - Model Protective Order, # 3 Olson Declaration, # 4 Exhibit 1 to Olson Declaration)(Olson, Wendy) |
| 10/13/2025 | 111 | MOTION in Limine Wendy Olson appearing for Plaintiff Rebecca Scofield. Responses due by 11/3/2025 (Olson, Wendy) |
| 10/13/2025 | 112 | TRIAL BRIEF by Rebecca Scofield. (Olson, Wendy) |
| 01/23/2026 | 113 | MEMORANDUM DECISION AND ORDER - Defendants Motion to Exclude Expert Testimony and Evidence of Rebecca Bohn, MA and Rebecca Tallent (Dkt. 102 ) is GRANTED in part and DENIED in part. Plaintiffs Motion for Entry of Protective Order (Dkt. 110 ) is GRANTED. Plaintiffs Motion in Limine (Dkt. 111 ) is GRANTED.Signed by US Magistrate Judge Raymond E. Patricco. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (lm) |
| 01/26/2026 | 114 | PROTECTIVE ORDER. Signed by US Magistrate Judge Raymond E. Patricco. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (lm) |
| 02/02/2026 | 115 | Exhibit List *Amended* by Rebecca Scofield.. (Attachments: # 1 Amended Exhibit List) (Olson, Wendy)On 2/13/2026 received lodging of 1 flash drive re: amended exhibit list and is maintained in the Clerk's office file room Modified on 2/13/2026 to add lodging info (ac). |
| 02/04/2026 | 116 | DOCKET TEXT NOTICE of Hearing: A 4-day Jury Trial is set to begin on 2/24/2026 at 9:00 a.m. (Mountain Time) in Boise - Courtroom 3 before US Magistrate Judge Raymond E. Patricco. (st) |
| 02/05/2026 | 117 | First MOTION to Dismiss for Lack of Jurisdiction Ashley Guillard appearing for Defendant Ashley Guillard. Responses due by 2/26/2026 (Attachments: # 1 Memorandum in Support, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M)(Guillard, Ashley) |
| 02/05/2026 | 118 | DOCKET ENTRY ORDER: Following today's conference, the Court HEREBY ORDERS the following: (i) Defendant shall file her Motion for Continuance on or before 2/6/26; (ii) Plaintiff shall respond to Defendant's anticipated Motion for Continuance and Defendant's 117 Motion to Dismiss by 2/12/26; and (iii) Defendant shall file any replies in support of Defendant's Motion for Continuance and Motion to Dismiss by 2/13/26. Signed by US Magistrate Judge Raymond E. Patricco. (dg) |
| 02/05/2026 | 119 | DOCKET TEXT Minute Entry for proceedings held before US Magistrate Judge Raymond E. Patricco: Initial Pretrial Conference held on 2/5/2026. Cory Carone and |

| | | |
|---|---|---|
| | | Wendy Olson appeared on behalf of the Plaintiff. Defendant Ashley Guillard appeared pro se. Court noted second pretrial conference schedule for 2/23/2026, in person. Court to issue timeline to file response to Defendants Motion to Dismiss. Defendant advised Court a Motion to Continue Trial would be filed by end of day on 2/6/2026. Trial procedures and jury selection discussed. Court confirmed Defendant was receiving court filings electrotonically. (ESR B. Fifer.) Audio File Location Zoom (10:00 - 10:42AM). (bf) (Entered: 02/06/2026) |
| 02/06/2026 | | Set/Reset Deadlines as to 117 First MOTION to Dismiss for Lack of Jurisdiction . Responses due by 2/12/2026 Replies due by 2/13/2026. (lm) |
| 02/06/2026 | 120 | First MOTION to Continue *Trial* Ashley Guillard appearing for Defendant Ashley Guillard. Responses due by 2/27/2026 (Attachments: # 1 Memorandum in Support)(Guillard, Ashley) |
| 02/09/2026 | 121 | MEMORANDUM in Opposition re 117 First MOTION to Dismiss for Lack of Jurisdiction filed by Rebecca Scofield. Replies due by 2/23/2026.(Olson, Wendy) |
| 02/09/2026 | 122 | MEMORANDUM in Opposition re 120 First MOTION to Continue *Trial* filed by Rebecca Scofield. Replies due by 2/23/2026.(Olson, Wendy) |
| 02/11/2026 | 123 | REPLY to Response to Motion re 120 First MOTION to Continue *Trial*, 117 First MOTION to Dismiss for Lack of Jurisdiction filed by Ashley Guillard.Motion Ripe Deadline set for 2/12/2026.(Guillard, Ashley) |
| 02/15/2026 | 124 | MEMORANDUM DECISION AND ORDER denying 117 Motion to Dismiss for Lack of Jurisdiction and denying 120 Motion to Continue. Signed by US Magistrate Judge Raymond E. Patricco. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (st) |
| 02/18/2026 | 125 | MOTION to Take Judicial Notice Wendy Olson appearing for Plaintiff Rebecca Scofield. Responses due by 3/11/2026 (Attachments: # 1 Olson Declaration, # 2 Exhibit A to Olson Decl., # 3 Exhibit B to Olson Decl., # 4 Exhibit C to Olson Decl., # 5 Exhibit D to Olson Decl.)(Olson, Wendy) |
| 02/18/2026 | 126 | DOCKET ENTRY ORDER RE: 125 MOTION to Take Judicial Notice. The briefing schedule is shortened. Defendant shall respond by 5:00 p.m. (Mountain) on 2/20/26. Plaintiff's reply, if any, is due on or before 8:00 a.m. (Mountain) on 2/23/26. Signed by US Magistrate Judge Raymond E. Patricco. (dg) |
| 02/18/2026 | | Set/Reset Deadlines as to 125 MOTION to Take Judicial Notice . Defendant shall respond by 5:00 p.m. (Mountain) on 2/20/26. Plaintiff's reply, if any, is due on or before 8:00 a.m. (Mountain) on 2/23/26 Per DEO 126 (lm) (Entered: 02/20/2026) |
| 02/19/2026 | 127 | DOCKET TEXT NOTICE RESETTING HEARING (Courtroom change only):Pretrial Conference set for 2/23/2026 10:00 AM in Boise - Courtroom 3 before US Magistrate Judge Raymond E. Patricco. Jury Trial set for 2/24/2026 09:00 AM in Boise - Courtroom 3 before US Magistrate Judge Raymond E. Patricco. (st) |
| 02/22/2026 | 128 | PRETRIAL MEMORANDUM by Ashley Guillard. (Attachments: # 1 Supplement Witness List)(Guillard, Ashley) |
| 02/22/2026 | 129 | PRETRIAL MEMORANDUM by Ashley Guillard. (Guillard, Ashley) |
| 02/22/2026 | 130 | PRETRIAL MEMORANDUM by Ashley Guillard. (Guillard, Ashley) |
| 02/23/2026 | 131 | PRETRIAL MEMORANDUM by Ashley Guillard. (Guillard, Ashley) |
| 02/23/2026 | 132 | PRETRIAL MEMORANDUM by Ashley Guillard. (Guillard, Ashley) |

| | | |
|---|---|---|
| 02/23/2026 | 133 | Exhibit List *Second Amended* by Rebecca Scofield.. (Attachments: # 1 Second Amended Exhibit List)(Olson, Wendy) |
| 02/23/2026 | 134 | ORDER RE: PLAINTIFFS REQUEST TO TAKE JUDICIAL NOTICE - Plaintiffs Request to Take Judicial Notice (Dkt. 125 ) is GRANTED. Signed by US Magistrate Judge Raymond E. Patricco. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (lm) |
| 02/23/2026 | 135 | Exhibit List *Amended* by Ashley Guillard.. (Guillard, Ashley) |
| 02/23/2026 | 148 | DOCKET TEXT Minute Entry for proceedings held before US Magistrate Judge Raymond E. Patricco: Final Pretrial Conference held on 2/23/2026. Wendy Olson and Cory Carone appeared as counsel for the Plaintiff. Ashley Guillard appeared pro se. The Court addressed Defendants late filed documents. The Plaintiff objected, the Court overruled the objection and permitted the documents consideration. Court discussed trial procedures and preliminary jury instructions. Court provided exhibit numbers and ordered the final copy of exhibits be submitted to the Court. Court further requested parties discuss exhibits and determine which would be stipulated to for authenticity. Case to proceed to jury trial on February 24, 2026. (ESR A. Bowline.) (bf) (Entered: 03/03/2026) |
| 02/24/2026 | 136 | Exhibit List *Second Amended Exhibit List* by Ashley Guillard.. (Guillard, Ashley) |
| 02/24/2026 | 137 | Minute Entry for proceedings held before US Magistrate Judge Raymond E. Patricco: SEALED Jury Selection held on 2/24/2026. (Court Reporter: Anne Bowline) (Attachments: # 1 jury list, # 2 selected juror chart) (st) |
| 02/24/2026 | 138 | Minute Entry for proceedings held before US Magistrate Judge Raymond E. Patricco: Jury Trial Day 1 held on 2/24/2026. Jury Trial will resume on 2/25/2026 08:30 AM in Boise - Courtroom 3 before US Magistrate Judge Raymond E. Patricco. (Court Reporter: Anne Bowline) (st) |
| 02/24/2026 | 139 | Proposed Jury Instructions by Ashley Guillard. (Guillard, Ashley) |
| 02/25/2026 | 140 | Minute Entry for proceedings held before US Magistrate Judge Raymond E. Patricco: Jury Trial Day 2 held on 2/25/2026. Jury Trial will resume 2/26/2026 08:30 AM in Boise - Courtroom 3 before US Magistrate Judge Raymond E. Patricco. (Court Reporter A. Bowline.) (bf) (Main Document 140 replaced on 2/26/2026) (bf). |
| 02/26/2026 | 141 | Minute Entry for proceedings held before US Magistrate Judge Raymond E. Patricco: Day 3 Jury Trial held on 2/26/2026. Jury Trial will resume 2/27/2026 08:30 AM in Boise - Courtroom 3 before US Magistrate Judge Raymond E. Patricco. (Court Reporter A. Bowline.) (bf) |
| 02/27/2026 | 142 | First MOTION to Disqualify Juror *#13* Ashley Guillard appearing for Defendant Ashley Guillard. Responses due by 3/20/2026 (Attachments: # 1 Memorandum in Support, # 2 Affidavit)(Guillard, Ashley) |
| 02/27/2026 | 143 | Minute Entry for proceedings held before US Magistrate Judge Raymond E. Patricco: Jury Trial day 4 (final) held on 2/27/2026. (Court Reporter A. Bowline.) (bf) |
| 02/27/2026 | 144 | Exhibit List by Ashley Guillard.(ac) |
| 02/27/2026 | 145 | SEALED Jury Notes. (ac) |
| 02/27/2026 | 146 | Special Verdict Form. (jd) |
| 02/27/2026 | 147 | Plaintiff's Second Amended Exhibit List by Rebecca Scofield.(jd) |
| 02/27/2026 | 150 | Final Jury Instructions. (lm) (Entered: 03/05/2026) |

| | | |
|---|---|---|
| 03/05/2026 | 149 | JUDGMENT - Judgment is hereby entered in favor of Plaintiff Rebecca Scofield and against Defendant Ashley Guillard for all claims contained in Plaintiffs First Amended Complaint (Dkt. 76 ). Defendant shall pay Plaintiff $2,500,000 in compensatory damages and $7,500,000 in punitive damages. Signed by US Magistrate Judge Raymond E. Patricco. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (lm) |
| 03/19/2026 | 151 | MOTION for Attorney Fees Wendy Olson appearing for Plaintiff Rebecca Scofield. Responses due by 4/9/2026 (Attachments: # 1 Memorandum in Support of Motion for Attorney Fees, # 2 Affidavit of Wendy Olson, # 3 Exhibit A to Olson Affidavit, # 4 Exhibit B to Olson Affidavit)(Olson, Wendy) |
| 03/19/2026 | 152 | BILL OF COSTS by Rebecca Scofield. Taxation of Costs due by 4/2/2026 (Attachments: # 1 Affidavit of Olson ISO Motion for Costs, # 2 Exhibit A to Olson Affidavit)(Olson, Wendy) |
| 04/06/2026 | 153 | First MOTION to Set Aside Judgment *DKT. 149* Ashley Guillard appearing for Defendant Ashley Guillard. Responses due by 4/27/2026 (Attachments: # 1 Memorandum in Support, # 2 Affidavit)(Guillard, Ashley) |
| 04/06/2026 | 154 | NOTICE OF APPEAL USCA - 26-2190 as to 74 Order on Motion for Partial Summary Judgment,, Order on Motion for Leave to File, 149 Judgment, 96 Order on Motion for Reconsideration, by Ashley Guillard. Filing Fee Due. $ 605, receipt number AIDDC-3082092. (Notice sent to Court Reporter & 9th Cir) (Guillard, Ashley) Modified on 4/10/2026 (lm). |
| 04/09/2026 | 155 | RESPONSE to Motion re 151 MOTION for Attorney Fees *and re 152 Motion for Costs* filed by Ashley Guillard. Replies due by 4/23/2026.(Guillard, Ashley) |
| 04/09/2026 | 156 | USCA Case Number 26-2190 for 154 Notice of Appeal, filed by Ashley Guillard. (lm) (Entered: 04/10/2026) |
| 04/09/2026 | 157 | USCA Scheduling Order USCA - 26-2190 as to 154 Notice of Appeal, filed by Ashley Guillard. (Notice sent by e-mail to Court Reporter) (lm) (Entered: 04/10/2026) |
| 04/20/2026 | 158 | TRANSCRIPT REQUEST by Ashley Guillard for proceedings held on 02/24/26-02/27/26 before Judge Patricco, (Notice sent by e-mail to Court Reporter) (Guillard, Ashley) |
| 04/23/2026 | 159 | REPLY to Response to Motion re 153 First MOTION to Set Aside Judgment *DKT. 149*, 151 MOTION for Attorney Fees filed by Rebecca Scofield.Motion Ripe Deadline set for 4/24/2026.(Olson, Wendy) |
| 04/27/2026 | 160 | MEMORANDUM in Opposition re 153 First MOTION to Set Aside Judgment *DKT. 149* filed by Rebecca Scofield. Replies due by 5/11/2026.(Olson, Wendy) |
| 05/11/2026 | 161 | REPLY to Response to Motion re 153 First MOTION to Set Aside Judgment *DKT. 149* filed by Ashley Guillard.Motion Ripe Deadline set for 5/12/2026.(Guillard, Ashley) |
| 05/18/2026 | 162 | MOTION *to Redact Transcript on Appeal* Wendy Olson appearing for Plaintiff Rebecca Scofield. Responses due by 6/8/2026 (Olson, Wendy) |
| 05/19/2026 | 163 | DOCKET ENTRY ORDER GRANTING 162 Motion. The Court Reporter is ordered to redact the transcript by replacing Plaintiff's minor child's name with the child's initials. Signed by US Magistrate Judge Raymond E. Patricco. (dg) |
| 05/20/2026 | 164 | Sealed Transcript of Voir Dire Proceedings filed for dates of 2/24/2026 before Judge Raymond E. Patricco, re 154 Notice of Appeal, 137 Jury Selection. Court Reporter Anne Bowline, Email Anne_Bowline@id.uscourts.gov. (amb) |

| | | |
|---|---|---|
| 05/20/2026 | 165 | Notice of Filing of Official Transcript of Volume I of Trial Proceedings filed for dates of 2/24/2026 before Judge Raymond E. Patricco, re 138 Jury Trial - Begun, 154 Notice of Appeal,. Court Reporter Anne Bowline, Email Anne_Bowline@id.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/10/2026. Redacted Transcript Deadline set for 6/22/2026. Release of Transcript Restriction set for 8/18/2026. (amb) |
| 05/20/2026 | 166 | Notice of Filing of Official Transcript of Volume II of Trial Proceedings filed for dates of 2/25/2026 before Judge Raymond E. Patricco, re 154 Notice of Appeal, 140 Jury Trial - Held,. Court Reporter Anne Bowline, Email Anne_Bowline@id.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/10/2026. Redacted Transcript Deadline set for 6/22/2026. Release of Transcript Restriction set for 8/18/2026. (amb) |
| 05/20/2026 | 167 | Notice of Filing of Official Transcript of Volume III of Trial Proceedings filed for dates of 2/26/2026 before Judge Raymond E. Patricco, re 141 Jury Trial - Held, 154 Notice of Appeal,. Court Reporter Anne Bowline, Email Anne_Bowline@id.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/10/2026. Redacted Transcript Deadline set for 6/22/2026. Release of Transcript Restriction set for 8/18/2026. (amb) |
| 05/20/2026 | 168 | Notice of Filing of Official Transcript of Volume IV of Trial Proceedings filed for dates of 2/27/2026 before Judge Raymond E. Patricco, re 154 Notice of Appeal, 143 Jury Trial - Completed, Terminate Motions. Court Reporter Anne Bowline, Email Anne_Bowline@id.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/10/2026. Redacted Transcript Deadline set for 6/22/2026. Release of Transcript Restriction set for 8/18/2026. (amb) |
| 06/10/2026 | 169 | MEMORANDUM DECISION AND ORDER - Plaintiff Rebecca Scofields Motion for Attorney Fees (Dkt. 151 ) is GRANTED in part, and DENIED in part as follows: (i) Plaintiff is awarded $27,699.00 in attorney fees. The Motion is GRANTED in this respect; (ii) the Motion is DENIED in all other respects. Defendant Ashley Guillards Rule 60(b)(3) Motion for Relief of Judgment Due toFraud (Dkt. 153 ) is DENIED. Signed by US Magistrate Judge Raymond E. Patricco. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (lm) |



| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 09/28/2026 11:27:09 | | | |
| **PACER Login:** | Stoel2022 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:22-cv-00521-REP |
| **Billable Pages:** | 16 | **Cost:** | 1.60 |